# SOLOMON LUERY *vs.* STATE OF MARYLAND.
## LEAH LUREY *vs.* STATE OF MARYLAND.

*Criminal law*: *receiving stolen goods; evidence; other acts; knowledge; dates different from those alleged in indictment. Accomplices*: *evidence; corroboration. Prayers*: *in criminal cases; advisory only.*

In the case of a trial of parties indicted for receiving stolen goods, it is admissible to prove more than one act as reflecting upon the general knowledge of the accused.          p. 288

In criminal law, when guilty knowledge is involved, evidence may be introduced of other crimes similar to the ones charged.
                                                              p. 288

In the trial of parties for receiving stolen goods, the fact that the State proved the receipt of the goods at a different date from that named in the indictment does not present reversible error.                                        p. 290

In general, a conviction will not be permitted to stand, if based exclusively on the uncorroborated testimony of accomplices.
                                                              p. 293

But the corroborating testimony necessary to support a conviction need not be evidence sufficient in itself to convict.  p. 294

In criminal cases, prayers are advisory only and not binding on the jury.                                        p. 293

The jury in criminal cases are the judges of the law and of the legal effect and sufficiency of evidence, and the Court only determines the admissibility of the evidence.      pp. 294-295

*Query*: Whether one guilty of larceny is an accomplice within the meaning of the law of one charged with receiving the stolen goods.                                    p. 295

*Decided June 23rd, 1911.*

Two appeals in one record from the Criminal Court of Baltimore City (DOBLER, J.).

The causes were argued together before BOYD, C. J., PEARCE, BURKE, URNER and STOCKBRIDGE, JJ.

*Eugene O'Dunne,* for Solomon Luery, one of the appellants.

*Thomas J. Mason* submitted a brief for Leah Luery, one of the appellants.

*Raymond S. Williams* (with whom was *Isaac Lobe Straus, the Attorney-General,* and *Albert S. J. Owens* on the brief), for the State.

BOYD, C. J., delivered the opinion of the Court.

Solomon Luery, Leah Luery and two other parties were indicted separately for receiving stolen goods, knowing them to have been stolen. The cases were tried before the Court without a jury—having been by agreement heard together. The property alleged to have been stolen was solder which belonged to the United Railways and Electric Company of Baltimore, and Samuel J. Barrett, an employee of that company plead guilty to the larceny of it. The Court rendered verdicts of guilty against the two Luerys, and found the other two not guilty. The two appeals taken by the Luerys were heard together, and will be disposed of in one opinion.

Leah Luery is the wife of Solomon Luery. They are junk dealers and have a place in the rear of a saloon on the corner of Gay and Lexington streets, and also another place on Harrison street. Solomon Luery testified that the main business was on Lexington street and the other place was used for storage. The license was in the wife's name.

There are four bills of exception in the record. The first three present rulings on the admissibility of evidence, and the fourth was taken to the ruling of the Court on a motion

to discharge each of the defendants, which will be hereinafter set out.

After two detectives, two policemen and an employee of the railroad company were examined, Samuel J. Barrett was called by the State. The indictments charged the defendants with having received stolen goods on the 10th day of August, 1910. Barrett was arrested in the afternoon of that day, and had a cake of solder in his pocket. After his arrest detectives Davis and Bradley and Barrett went to the corner of Gay and Lexington streets. Detective Bradley testified that he first went into the defendant's place alone, showed Mrs. Luery the piece of solder he had taken from Barrett, and asked her if she had bought anything like that in the last two or three months. She said she had not, and then said that officer Cooper had shown her the "lookout sheet" dated the 20th of July, 1910. They are issued by the department to the policemen and detectives, and this one read:

"Stolen from Trouble Station, U. Ry. & E. Co., since 1st inst., about 75 lbs. wiping solder in ingots 5¾ in. long, 2½ in. wide and 1½ in. thick, stamped 'Extra Quality Wiping Solder.' Look over junk stores, plumbers, tinners, etc."

Detective Bradley then went to the door and called detective Davis and Barrett. The three went into the store, and Bradley gave this account of what then occurred: "When Mrs. Luery saw Barrett she reached down behind the counter and produced this ingot and said, Yes, I bought that. I said, from whom did you buy it? She said, that man there, meaning Barrett. I said, What did you do with the rest you bought? She said, I sold it. I said, Do you know who to? She said, I don't know now; I don't remember." He then went to Harrison street where he saw Solomon Luery and showed him the piece of solder he had found on Barrett. He said he had not bought anything of that kind. The piece which Mrs. Luery got from under the counter was marked "Superior Extra Fine Wiping Solder," and on the piece found on Barrett was marked "Extra Wiping Solder."

The testimony of the witness Fox was that the company used both kinds—the one has more tin in it and is brighter than the other. Captain Gilbert, who was connected with the United Railways, said complaint was made to him on February 19th, 1910, that wiping solder was being stolen from the East Baltimore Trouble Station. He went to the junk dealers along certain streets, and the first place he visited was Luery's on Lexington street. He saw Mrs. Luery and asked if she bought any of that kind of material and she said no. He told her if any of it came in to notify the police, that they had been losing some of it.

Barrett testified that he had been employed at the East Baltimore Street Trouble Station, and said the first tin or solder he took from the company was about seven or eight months before he was arrested; that it was the kind of material Mr. Bradley found on him, and that the company handles solder like the samples shown him. He said he sold the solder taken by him on Lexington street, to Solomon Luery; that he received forty cents a cake for it, and a cake contained five pounds; that it was worth about sixteen cents a pound. He also said that Solomon Luery advised him to continue it. He was asked whether, after the first time, he sold any more solder to Solomon Luery or wife, and replied that he had, and was asked about how long it was after the first time, and replied, "On various occasions—well, averaging maybe about a week,—five or six days between, and maybe two weeks between." In answer to how much he took there at that time he said, "Mostly one cake, forty cents worth." He said he carried the cake in his hip pocket and sometimes he would get forty-five cents from the Luerys, but very seldom, and never did get more than forty-five cents for a five pound cake from them. He said sometimes Mrs. Luery was there and paid him. He was then asked, "How many times, if you can estimate, between February, 1910, and the 20th of July, 1910, did you take solder and sell it down there, either to Luery or his wife Leah," and answered, "I should judge about half a dozen times."

The first exception was taken to that question and answer. He then said he would sell it to whichever was there. If both were there, he would sell it to either—one would take it and the other pay him. · He was then asked, "Did either Solomon Luery or his wife, or both, say anything to you in reference to coming back," and replied, "Yes, sir; they told me to come back and if they saw me on the street they wanted to know why I didn't bring more solder." Permitting that question to be asked and answered formed the ground for the second exception.

There can be no doubt that it is permissible in a case of this character to prove more than one act as reflecting upon the guilty knowledge of the accused. It might very well happen that one would innocently purchase a cake of solder or other article without having any reason to suspect it had been stolen, but a number of such sales at about one-half of the value of the article, especially if made by an employee of a company which used it, ought to suggest to any one that there was something wrong. In this State there have been many decisions authorizing admission of evidence of other crimes when guilty knowledge or a similar question is involved. In *Bloomer* v. *State,* 48 Md. 521, where a conspiracy was charged with reference to passes on the C. B. & Q. R. R., some of the same character of passes on the B. & M. R. R. were admitted. In *Bishop* v. *State,* 55 Md. 138, in which the defendants were indicted for uttering as well as forging a bond, it was held to be competent for the State to show that on or about the time of the charge in the indictment the accused held and uttered similarly forged instruments. In *Bell* v. *State,* 57 Md. 108, evidence of uttering a check on the day after uttering the one charged in the indictment was held admissible, although the traverser had been acquitted of that. In *Lamb* v. *State,* 66 Md. 285, evidence was admitted that the traverser made a subsequent attempt to accomplish an abortion by different means, to show with what purpose and intent he made the attempt charged in the

indictment, as well as to corroborate the evidence of the first attempt.    The case of *Rex* v. *Ellis,* 6. B. & C. 145, was referred to, in which a shopman was indicted for robbing his employer's money drawer of a particular sum of money on a named day, evidence was admitted that the prisoner had robbed the drawer at other times.    BAYLEY, J., delivering the opinion, said: "Generally speaking, it is not competent to a prosecutor to prove a man guilty of one felony, by proving him guilty of another unconnected felony; but where several felonies are connected together, and form part of one entire transaction, then the one is evidence to show the character of the other."    In *Carnell* v. *State,* 85 Md. 1, traverser was indicted for obtaining goods under false pretenses on January 30th, 1896.    A letter found in his possession addressed to the president of a bank dated February 22, 1896, asked him to certify to the fact that he had $100.00 on interest in the bank, that he wanted to give a check dated July 2nd, 1896.    Below was written: "Hagerstown, Md., 2-27, '96.    To whom it may concern: The above is all right.    The money is here, payable July 2, 1896," and purported to be signed by the president.    The Court said: "The representation made in the latter being, according to its purport, subsequent in date to a similar statement set forth in the bill of particulars, may not prove that the latter was in fact made, yet the letter was admissible for the purpose of showing guilty knowledge.    The fact that he had on his person a paper in his own handwriting which contained the same false statement he was charged with in the indictment tends to prove guilty knowledge as to both."    And the Court also said that the letter was admissible for the purpose of showing that the defendant had devised a scheme to obtain goods wherever he could by falsely representing that he had money on deposit in that bank.

In the case of *Beuchert* v. *State,* 165 Ind. 523, as annotated in 6 *Am. & Eng. An. Cases,* 914, many cases are cited to show that in a prosecution for receiving stolen goods, evi-

dence of the defendant's possession of other stolen goods prior
to or at the time of the commission of the offence is admissible
as testimony to establish that the defendant received with
guilty knowledge the goods specified in the indictment. Many
other cases might be referred to, but we do not understand
the general proposition to be questioned. It is contended,
however, that inasmuch as the State failed to prove that
the goods alleged to have been received were received at the
time named in the indictment, to wit, August 10th, 1910, it
was required to select some definite time on which the State
relied for conviction, and that evidence of other receipts of
stolen goods, in so far as admissible at all, could only be
admitted for the purpose of reflecting upon the guilty knowl-
edge of the defendants at such particular time. Of course,
the mere fact that the State proved the receipt at a different
date from that named in the indictment could make no differ-
ence, but, as the record shows, there was a failure to prove
the charge on the date named in the indictment, for the
solder stolen that day was still in the possession of Barrett
when he was arrested, and hence had not been received by
either defendant. If application had been made to the Court,
it might have determined whether it would be proper to
require the State to elect some time in each case, as the
one relied on for conviction for each particular traverser, if
that could be done, but there was no such motion, and the
four cases were tried together. It was perhaps impossible
to name any particular day, and, if that be so, it would
practically have furnished immunity to a receiver of stolen
goods if the State had to elect some one definite time and
rely on that alone. Suppose the witness had been asked to
state whether or not he had sold to Luery, or his wife, any
of the solder stolen by him, and if so when, and he had
replied: "Yes, half a dozen times, but I do not remember
the dates." The State could certainly have followed that up
by endeavoring to show as nearly as possible when it was
done. He had already testified without objection that he

had taken solder at different times, and sold it to the Luerys. The dates named in the question in the first bill of exceptions (February, 1910, and July, 1910) were apparently used by reason of the testimony already given. Captain Gilbert had said, it will be remembered, that he was informed in February, 1910, that wiping solder was being stolen from the company, and he notified the junk dealers, including Mrs. Luery, and then the "look-out sheet" was read to her by Officer Cooper on or about July 20th, ——, the date of that sheet. The record shows that after the second exception was taken the State followed the testimony up by asking if Barrett had sold any of the solder taken by him from that company between the 20th of July and the 20th of August— the 20th of August being a mistake either in the record or in the question, as the arrest was made on the 10th. That question was not objected to.

Inasmuch as it would be extremely difficult to establish any definite day, and the proof showed that the thefts covered the periods included in the question, the State had the right to take the dates, between which notices were shown to have been given Mrs. Luery, and find out, if possible, how often, if at all, she or her husband or both, had bought solder within those dates. The question might have been followed up in chief, or on cross-examination, to ascertain the dates more definitely than had yet been done, and if they could have been fixed accurately, the traversers, if they were in danger of being injured, could have asked the Court to require the State to elect some date for each one, but as we have seen, that was not asked.

If any evidence, objected to, related to receipts subsequent to the time elected by the State, whether or not it should have been excluded we need not do more than say, that to exclude it in a case like this, where there was the same thief, the same article, the same owner and same receivers would have been of very doubtful propriety, as they were practically one entire transaction. The fact that the four cases

were heard together and receipts at different times might have been relied on would have made it more difficult than in ordinary cases to confine the testimony of other acts to those prior to the date relied on for conviction. So without further discussion of the question, we are of the opinion that the evidence in the first and second exceptions was admissible. The third we do not understand to be pressed. It apparently had nothing to do with the Luerys.

It only remains to consider the motion presented by the fourth bill of exceptions. It is as follows: "The testimony being concluded, each of the defendants by their counsel moved that they, and each of them, be discharged on the ground that upon the uncorroborated evidence of accomplices connecting the defendants with a crime, the law does not permit a conviction to stand."

The case of *Lanasa* v. *State,* 109 Md. 602, was not reversed on the ground that he was convicted upon uncorroborated evidence of accomplices. In speaking of their evidence, we said: "Both were under indictment, and upon the uncorroborated evidence of accomplices, connecting Lanasa with the crime, the law does not permit a conviction to stand. *Wharton's Crim. Evidence,* 8 Ed. sections 441-442." It is true that at common law a verdict of the jury would not be set aside merely because founded on the evidence of an accomplice which was not corroborated, but by legislation in many states of this country and by the practice of most of the Courts, where there is no such statute, such a verdict is regarded as an exceedingly dangerous one, and is not approved by the Courts. In those jurisdictions where it is not positively prohibited unless corroborated, the evidence of an accomplice is universally received with caution and weighed and scrutinized with great care. "The suspicion with which the testimony of an accomplice is received by the Courts, and their unwillingness to sustain convictions resting wholly upon the uncorroborated evidence of such a person, have led to the very general and proper practice of

advising or cautioning juries against convicting upon the uncorroborated testimony of an accomplice." Note to *Rex v. Tate* (1908), 2 K. B. 680, annotated in 15 *Am. & Eng. An. Cases,* 698, where numerous cases are cited.

In the note just referred to many cases are collected on the question whether it is reversible error not to so instruct the jury—some Courts taking one, and others the other position on that subject. But the undoubted fact is that the experience of the Courts, which is certainly much greater than that of juries, is that it is unsafe, at least in the great majority of cases, to rest a conviction upon the uncorroborated evidence of an accomplice. Any one who has had experience at *nisi prius* trials knows how captivating is the story of one relating the circumstances connected with some mysterious crime. When such an one has as a motive the prospect of freedom, a milder sentence or the favor of the officers who have him in charge, an innocent one may undoubtedly be made to suffer, if great caution is not used. Hence it would seem to be safer to require some corroboration, and inasmuch as under our system the Courts do not charge the juries in criminal cases, and the juries are made judges of the law and of the facts, one effective way of affording relief is for the trial Court not to permit a conviction to stand if based *exclusively* on such testimony, if a motion for a new trial is seasonably made, or the trial Courts might well adopt the practice of granting prayers advising or cautioning juries against conviction without corroboration. Under our system prayers are advisory and not binding on juries in criminal cases, and, of course, as has been distinctly decided in previous cases, when a prayer is granted, the Court must be careful to so word it that the jury will understand that it is not binding. If then such a prayer is granted, it would be along the lines adopted by most Courts in States where there is no statute requiring corroboration. It is true that a Court can not be required to instruct the jury in a criminal case in this State, but in view of the

almost universally approved practice in other States of
advising or cautioning them in the class of cases spoken of,
we would recommend that trial Courts grant such prayers
if properly framed, when requested, or when they deem it
desirable, even if not requested.

They should not, however, require too much in the way
of corroboration, and while we are not now called upon to
enter into a general discussion of what would be sufficient,
we will add that it is not required to have sufficient evidence
to convict, exclusive of the accomplice's testimony, for if that
be required, there is but little use in having the evidence of
the accomplice. As the reason for the rule, as adopted by
most Courts, is that the testimony of an accomplice alone
and unsupported is regarded as too doubtful to be safe, the
important matter is to have him supported in at least some
of the material points involved, tending to show the guilt of
the accused.

We have felt called upon to say this much, as the mean-
ing of the statement in the Lanasa case does not seem to
be wholly understood, but we have no doubt about the cor-
rectness of the action of the lawer Court in refusing to
discharge the Luerys under the motion quoted above.

In *Dick* v. *State,* 107 Md. 11, the traverser was charged
with embezzlement. At the close of the evidence of the prose-
cution, which showed that the defendant had failed to account
for the money collected by him for his client, the defendant
moved to strike out the testimony as being insufficient to
prove that he was the agent of his client, within the meaning
of the word agent as used in the statute. This Court said:
"The motion to strike out the testimony of the State was in
legal effect a demurrer to the evidence, and an attempt to
obtain an instruction from the Court to the jury to render
a verdict for the defendant, and it is well settled that this
can not be done in Maryland, where the jury in criminal
cases are the judges of the law, and of the legal effect and
legal sufficiency of the evidence, and the Court only deter-

mines the admissibility of the evidence." The cases of *Franklin* v. *State,* 12 Md. 246; *Broll* v. *State,* 45 Md. 360; *Bloomer* v. *State,* 48 Md. 538; *Beard* v. *State,* 71 Md. 280, and *Ridgely* v. *State,* 75 Md. 512, were then cited.

In *Garland* v. *State,* 112 Md. 83, the defendant objected in advance to the testimony of each witness, and then made a motion at the conclusion of the State's testimony to strike out the evidence. The Court said: "We can not hold that the evidence produced by the State was not admissible because it did not *tend* to prove the commission of the offence charged in the indictment. The evidence of W. Wallace Elliott was corroborated by the evidence of the admissions or statements of the appellant, and was admissible for the purpose of showing the alleged conspiracy. With the sufficiency of the evidence we have nothing to do. The jury in this State are the judges of both the law and the facts, and where there is no reversible error in the rulings of the Court their finding must stand."

There is no practice in this State which would have authorized the Court to discharge the defendants as requested by the motion, and it was properly overruled.

We do not want to be understood as assuming that one guilty of larceny is an accomplice, within the meaning of the law, of one charged with receiving stolen goods. In this State larceny and receiving stolen goods are very distinct crimes, but it is not necessary for the purposes of this case, and hence we have expressed no opinion on that subject. It follows from what we have said the judgment in each case must be affirmed.

*Judgment affirmed in each case, the appellants to pay the costs.*