42 A.3d 83

**Mark Charles MORRIS**

v.

**STATE of Maryland.**

**No. 1705, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

April 25, 2012.

488

Martha Gillespie (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: MATRICCIANI, HOTTEN, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

HOTTEN, J.

Appellant, Mark Charles Morris, was charged with first and second degree assault in the Circuit Court for Baltimore

County. Following a jury trial on July 26 and 27, 2010, the jury returned guilty verdicts on both charges. On August 9, 2010, the circuit court consolidated appellant's sentencing with a burglary charge to which he had already pleaded guilty, and imposed a twelve year sentence, with a three year sentence for the burglary conviction to run concurrently. Appellant timely appealed, presenting the following questions, which we quote:

    1. Did the trial judge err in asking the prospective jurors during *voir dire* a "CSI" question directed at dispelling any juror's belief that scientific evidence was necessary in order to prove the State's case?

    2. Was the evidence insufficient to corroborate the accomplice testimony regarding the identity of the person who committed the assault?

For the reasons that follow, we affirm the circuit court.

## I. *VOIR DIRE* QUESTION

### A. Facts

Before the *voir dire* of the jury, the circuit court inquired whether appellant had objections to the State's proposed *voir dire* questions, and the following colloquy took place:

    [THE COURT]: While we're waiting for the jury both counsel have submitted a proposed voir dire. Does either side have any objection to any particular questions in either of the other[']s voir dire?

    [THE STATE]: None from the State your honor.

    [DEFENSE COUNSEL]: Your honor, I just have one objection to that C.S.I. question.

    [THE COURT]: Okay.

    [DEFENSE COUNSEL]: I just think that's an improper question. It[']s almost like the State's Attorney is trying to convey to the jury that she should not have a strong burden to present evidence in the case, and that certain evidence is in, presented that should be excused. And I just think it[']s, it[']s prejudicial to my client.

[THE COURT]: All right. Yes ma'am?

[THE STATE]: I disagree your honor. I think that because of the prevalence of popularity of those kinds of shows that jurors come in thinking that that is the kind of evidence that they're going to receive and put a[n] ... unfair burden on the State to produce that kind of evidence where in a case like this[,] that evidence is not going to be present. So, I do think that the instruction is or that the question is a fair question to ask.

[THE COURT]: All right. I'm going to, I'm going to overrule the objection. I think that is a fair question in light of the proliferance (phonetic.) of those types of shows and media coverage of [s]cientific and other types of evidence which is not typically brought in court proceedings. I think it[']s not overly prejudicial. So, I will allow that, I will ask that question. . . .

Therefore, during *voir dire*, the circuit court asked the following question:

Ladies and gentlemen, televisions shows such as C.S.I., Crossing Jordan and some of the like are fiction. They are not true. Many of the scientific methods used in those kinds of television shows are exaggerated or do not even exist. If you are selected as a juror in this case[,] you will be required to base your decisions solely on the evidence presented in court. Would any potential juror be unable to ignore the so called crime dramas they have been seeing on television, the movies and Internet or such and putting that aside in making your decision based solely on the evidence that you hear in court and not through some expectation of something that you've seen through the media or television? Is there anyone who would be so persuaded by such a show that they would not be able to judge this case fairly and impartially? Please rise if that applies to you. Let the record reflect that there is no such response.

## B. Discussion

■ In *Stringfellow v. State*, 199 Md.App. 141, 147, 20 A.3d 825 (2011), *rev'd, State v. Stringfellow*, 425 Md. 461, 464-65, 42 A.3d 27 (2012), we recently reiterated the importance of *voir dire* as follows:[1]

> "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *White v. State*, 374 Md. 232, 240 [821 A.2d 459] (2003) (quoting *Rosales–Lopez v. United States*, 451 U.S. 182, 188 [101 S.Ct. 1629, 68 L.Ed.2d 22] (1981)) (italics omitted), *cert. denied*, 540 U.S. 904 [124 S.Ct. 262, 157 L.Ed.2d 189] (2003). "[T]he 'overarching purpose of voir dire in a criminal case is to ensure a fair and impartial jury.'" *Wright v. State*, 411 Md. 503, 508 [983 A.2d 519] (2009) (quoting *Dingle v. State*, 361 Md. 1, 9 [759 A.2d 819] (2000)). "Indeed, the only purpose of voir dire in Maryland is to illuminate to the trial court any cause for juror disqualification." *Id. See White*, 374 Md. at 240 [821 A.2d 459] ("Without adequate voir dire, the trial judge is unable to fulfill his or her responsibility to eliminate those prospec-

---

1. The Court of Appeals recently decided *State v. Stringfellow*, 425 Md. 461, 464-65, 42 A.3d 27 (2012), in which it held that a party waives his or her objection to a *voir dire* question directed to the composition of the jury when the party later accepts the jury without qualification. After the trial court provided the erroneous *voir dire* question over the defendant's objection and jury selection was completed, the clerk asked the defendant and the State whether the jury panel was acceptable. *Id.* at 466, 42 A.3d 27. The defendant and the State responded that it was, and the court noted that "[t]he panel [was] acceptable to both sides." *Id.* At trial on weapons charges and in closing argument over the State's objection, the defendant highlighted the lack of fingerprint evidence linking him to the handgun, despite eyewitness testimony that the defendant was holding the handgun. *Id.* The jury convicted the defendant, but we reversed, holding that the defendant's objection to the *voir dire* question was preserved for appellate review and that the question was improper. *Stringfellow*, 199 Md.App. at 146 n. 1, 154, 20 A.3d 825. The Court of Appeals reversed, holding that the defendant's challenge to the *voir dire* question was not preserved. *Stringfellow*, 425 Md. at 468, 42 A.3d 27. While the Court's decision reversed the decision of this Court in that regard, the opinion was based on the assumption that the *voir dire* question in *Stringfellow* was improperly, yet harmlessly, propounded by the trial court. *Id.* at 468-69, 42 A.3d 27. As such, we believe that the principles regarding proper *voir dire* questions discussed in *Stringfellow*, 199 Md.App. at 146-54, 20 A.3d 825, remain applicable.

tive jurors who will be unable to perform their duty impartially.") (Italics omitted).

(Parallel citations omitted). The manner of *voir dire* is governed by Maryland Rule 4–312, and the Court of Appeals has held that "[i]n the absence of a statute or rule prescribing the questions to be asked of the venire persons during the examination[,] the subject is left largely to the sound discretion of the court in each particular case." *Moore v. State*, 412 Md. 635, 644, 989 A.2d 1150 (2010) (internal quotation marks and citation omitted). The trial court's discretion "extends to both the form and the substance of questions posed to the venire." *Wright*, 411 Md. at 508, 983 A.2d 519. The Court of Appeals has explained that the abuse of discretion standard

is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways. It has been said to occur "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling is "violative of fact and logic," or when it constitutes an "untenable judicial act that defies reason and works an injustice."

There is a certain commonality in all these definitions, to the extent that a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.

*King v. State*, 407 Md. 682, 697, 967 A.2d 790 (2009) (quoting *North v. North*, 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994)) (internal citations omitted).

Based on this standard, Maryland appellate courts have held that though "it is impermissible to commit prospective

jurors to a decision in advance," a trial court may question potential jurors "about their attitudes concerning key issues to be raised at trial[.]" *Stringfellow,* 199 Md.App. at 148–49, 20 A.3d 825 (citing *Moore v. State,* 412 Md. 635, 989 A.2d 1150 (2010) (whether a prospective juror may give more weight to a State's witness's testimony); *Sweet v. State,* 371 Md. 1, 9–10, 806 A.2d 265 (2002) (whether sexual abuse charges stir up strong emotional feelings); *State v. Thomas,* 369 Md. 202, 798 A.2d 566 (2002) (whether a prospective juror has strong feelings regarding violations of narcotic laws); *Langley v. State,* 281 Md. 337, 378 A.2d 1338 (1977) (whether a prospective juror may give more weight to a police officer's testimony)).

Relying on *Charles and Drake v. State,* 414 Md. 726, 997 A.2d 154 (2010) and *Stringfellow v. State,* 199 Md.App. 141, 20 A.3d 825 (2011), appellant contends that the circuit court abused its discretion by asking the prospective jurors the "CSI" question.[2] In *Charles and Drake,* over defense counsel's objection, the trial court propounded the following "CSI-type" question during *voir dire:*

> I'm going to assume that many of you, from having done a few of these, watch way too much TV, including the so-called realistic crime shows like CSI and Law and Order. I trust that you understand that these crime shows are fiction and fantasy and are done for dramatic effect and for this dramatic effect they purport to rely upon, "scientific evidence," to convict guilty persons. While this is certainly acceptable as entertainment[,] you must not allow this entertainment experience to interfere with your duties as a juror. Therefore, if you are currently of the opinion or belief that you cannot convict a defendant without "scientific evidence," regardless of the other evidence in the case and

---

**2.** Preliminarily, the State argues that appellant did not preserve this issue for our review because, though he objected to the State's proposed *voir dire* question, appellant did not take exception to the question at issue when asked by the circuit court after *voir dire* and later accepted the jury as empaneled. As mentioned, the Court of Appeals recently ruled that a court's asking of the "CSI" question during *voir dire* goes to the composition of the jury. *Stringfellow,* 425 Md. at 469-73, 42 A.3d 27. Therefore, by accepting the jury as empaneled, appellant waived his argument now on appeal. Nevertheless, as discussed *infra,* appellant's argument, though waived, is without merit.

regardless of the instructions that I will give you as to the law, please rise....

*Charles and Drake,* 414 Md. at 730, 997 A.2d 154. Six members of the potential juror pool responded affirmatively and were stricken for cause for other reasons. *Id.* at 730 n. 5, 997 A.2d 154. The Court of Appeals focused on "whether the [trial] [c]ourt erred in propounding a voir dire question concerning whether prospective jurors could not 'convict' Drake and Charles in the absence of 'CSI-type' scientific evidence." *Id.* at 731, 997 A.2d 154. In doing so, the Court recognized that "[t]here is a significant debate about whether there truly is a 'CSI effect,' namely, the impact that viewing forensic crime dramas has upon juror behavior." *Id.* (citing the Honorable Dennis M. Sweeney, *The "CSI Effect" A Judge's Viewpoint: How Do Courtroom Dramas Affect the Work of the Courts?,* Justice Matters, Spring/Summer 2009, at 4). Although the Court of Appeals left for "another day" the issue of "whether a voir dire inquiry related to the purported 'CSI effect' is appropriate at a theoretical level," the Court centered its focus on whether the language used in the inquiry—the word "convict"—was appropriate. *Id.* at 733, 997 A.2d 154.

The Court looked to *State v. Hutchinson,* 287 Md. 198, 411 A.2d 1035 (1980), in which it addressed whether a trial judge erred in failing to instruct the jury that it could return a "not guilty" verdict in a rape case. The trial court in *Hutchinson* instructed the jury as follows:

> *Now, the verdict sheet which I will be giving you will show two possible verdicts, Count One guilty of rape in the first degree and Count Two guilty of rape in the second degree* .... If you find the defendant not guilty of rape in the first degree, then you consider rape in the second degree. If you find the defendant guilty of rape in the first degree, then, of course, you need not consider rape in the second degree.

*Hutchinson,* 287 Md. at 201, 411 A.2d 1035 (alteration in original). The Court reversed the conviction in *Hutchinson* and ordered a new trial because the trial court's instruction did not advise the jury that it could return a verdict of "not guilty," only "guilty." *Id.* at 208, 411 A.2d 1035. Specifically, the Court held:

While the trial judge instructed the jury that the State had the burden of proving every element of the crime charged, that the defendant was presumed innocent until proven guilty beyond a reasonable doubt and that no inference of guilt could be drawn from the defendant's failure to testify, nowhere in his instructions did the trial judge tell the jury that it could find the defendant not guilty. The State's retort that the defendant did not object is to no avail. If a defendant is entitled to have a jury instructed as to possible verdicts arising from the evidence, it seems manifest to us that he would have the right to have the jury told that it may find him not guilty. We can envision no right more fundamental to the defendant in a criminal jury trial.

*Id.* at 205–06, 411 A.2d 1035. Therefore, the Court ordered a new trial because the language of the jury instruction suggested that finding the defendant "guilty" was predetermined. *Id.* at 208, 411 A.2d 1035. After examining *Hutchinson,* the Court in *Charles and Drake* concluded that the voir dire question, like the jury instruction in *Hutchinson,* "suggested that the jury's only option was to convict, regardless of whether scientific evidence was adduced." *Charles and Drake,* 414 Md. at 737, 997 A.2d 154.

Appellant recognizes that unlike *Charles and Drake* and *Hutchinson,* the *voir dire* question in the present case did not employ the word "convict." Nevertheless, appellant directs us to our recent case of *Stringfellow v. State,* 199 Md.App. 141, 20 A.3d 825 (2011).[3] In *Stringfellow,* 199 Md.App. at 146, 20 A.3d 825, an appeal of a conviction for handgun violations, the lower court asked the *voir dire* panel, over defense counsel's objection: "Does any member of the panel believe that the State is

---

**3.** To reiterate, the Court of Appeals recently reversed our opinion in *State v. Stringfellow,* 425 Md. 461, 464-65, 42 A.3d 27 (2012), holding that the defendant waived his objection to the *voir dire* question directed to the composition of the jury by later accepting the jury as empaneled. Nevertheless, the Court assumed that the *voir dire* question was improperly propounded by the trial court, even though the error proved to be harmless. *Stringfellow,* 425 Md. at 468-69, 42 A.3d 27. In light of the framing of the issue before the Court of Appeals, we believe an examination of our opinion in *Stringfellow,* 199 Md.App. at 146-54, 20 A.3d 825, benefits our determination of the propriety of the *voir dire* question in this case.

required to utilize specific investigative or scientific techniques such as fingerprint examination in order for the defendant to be found guilty beyond a reasonable doubt?" We concluded that the question was "not distinctively different from the question posed in *Charles and Drake.*" *Id.* at 146, 20 A.3d 825. We stated that there was "no significant difference between the voir dire question used in [*Stringfellow* ] that ask[ed] whether jurors could find the defendant *guilty beyond a reasonable doubt,* and the voir dire question used in *Charles and Drake* that ask[ed] whether jurors could *convict* the defendant." *Id.* at 153, 20 A.3d 825. We held that the *voir dire* question fundamentally affected the defendant's right to a fair trial "because the language used 'preordained the result.' " *Id.* at 152, 20 À.3d 825 (quoting *Charles and Drake,* 414 Md. at 739, 997 A.2d 154). Therefore, we reversed appellant's convictions. *Id.* at 154, 20 A.3d 825.

■ The *voir dire* question posed in this case, however, does not suffer the same flaws as the questions in *Charles and Drake* and *Stringfellow.* Specifically, the *voir dire* question in the case *sub judice* did not in any way "suggest[ ] that finding the defendant 'guilty' was a foregone conclusion[ ]" or "fail to lay out any alternative" other than guilt. *Stringfellow,* 199 Md.App. at 151, 153, 20 A.3d 825. Here, the circuit court advised potential members of the jury that shows like CSI are fiction and use exaggerated or non-existent scientific methods, which is true. The court then stated that each member of the jury must base his or her decision "solely on the evidence presented in court." Then, the court asked "[w]ould any potential juror be unable to ignore the so called crime dramas they have been seeing on television, the movies and Internet ... and put[ ] that aside in making your decision based solely on the evidence that you hear in court and not through some expectation of something that you've seen through the media or television?" The court further inquired if "there [was] anyone who would be so persuaded by such a show that they would not be able to judge this case fairly and impartially?" No potential jurors responded that they would be unable to fairly and impartially judge this case. The court's statement was nothing more than a permissible *voir dire* question that "use[d] neutral language, asking the venire if they would 'give

either more weight or less weight,' or whether they 'have strong feelings,' or whether they have beliefs that might affect their ability to 'render a fair and impartial verdict.'" *Stringfellow*, 199 Md.App. at 153, 20 A.3d 825.

Based on the above, we cannot hold that the circuit court abused its discretion by posing the *voir dire* question, which merely mentioned the so-called "CSI effect."

## II. SUFFICIENCY OF THE EVIDENCE

### A. Facts

Adam Schuster, who was twenty-three years old at the time of trial, testified that while attending high school, he became acquainted with Amanda Picciotto. Mr. Schuster stated that he and Ms. Picciotto had resumed contact through MySpace, a social networking site, and that they met several times since. On March 31, 2009, Mr. Schuster received a text message from Ms. Picciotto's cellular telephone number around midnight or 1:00 a.m., asking him to meet her in a nearby park. Mr. Schuster jogged to the park, and when he arrived, he saw Ms. Picciotto and two or three others standing together in the park. He did not recognize the other individuals because it was dark, they were wearing baggy clothing, and they had hoods over their heads. He said that he spoke with Ms. Picciotto briefly, and during their conversation, he saw that one of the other individuals had a liquor bottle. Mr. Schuster also overheard some discussion of drugs.

Because he had ambitions of one day becoming a police officer and did not want to get into any trouble, Mr. Schuster decided to leave the park. As he was leaving the park, however, he was struck on the head from behind.[4] He did not see who hit him, but immediately fell to the ground. While he was on the ground, he was kicked and stomped. Mr. Schuster was unable to determine who or how many people were kicking him. After the attack, he was able to stand and walk home, but he did not see anyone else in the park. Mr.

---

**4.** The most prominent injury Mr. Schuster sustained in the altercation was a cut on his forehead, which required ten stitches. He testified that as he walked from the park, he heard someone cursing at him. He turned around and was immediately struck in the forehead.

Schuster woke up his parents, and they took him to the hospital, where he received ten stitches on his head and was treated for other injuries. When he left the hospital around noon the next day, Mr. Schuster reported the incident to the police.

On direct examination and cross-examination, Mr. Schuster stated that he was unsure how many people were assaulting him in the following colloquy:

[THE STATE]: Okay. Were you able to see who it was that was kicking you?

MR. SCHUSTER: Ah, no ma'am.

[THE STATE]: Backing up just a little bit ah, to the blow to the head, was it Amanda Picciotto that hit you in the head?

MR. SCHUSTER: I don't recall [ma'am] because I do remember as we were leaving that I wasn't the only one leaving. There was others leaving at, at that time. So, I, I don't think it was her.

[THE STATE]: Okay. Um, when you were on the ground[,] did there come a point where the kicking stopped?

MR. SCHUSTER: Um, eventually, yes ma'am.

[THE STATE]: All right.

MR. SCHUSTER: And they were shouting while the kicking was going on.

[THE STATE]: Okay. Were you able to determine how many people might have been kicking you?

MR. SCHUSTER: No ma'am.

[THE STATE]: Um, how did the assault end?

MR. SCHUSTER: It just kind of stopped. Like they stopped doing it. That's how it ended. I don't know any other way to describe it.

\* \* \*

[DEFENSE COUNSEL]: Okay. Um, now you also mentioned that you weren't sure how many people were kicking you and hitting you when you were on the ground?

MR. SCHUSTER: Yes ma'am.

[DEFENSE COUNSEL]: Okay. But you did say that they all, that they stomped on you?

MR. SCHUSTER: Ah, yes ma'am.

[DEFENSE COUNSEL]: So, you're sure it was more than one person, correct?

MR. SCHUSTER: Ah, it seems to be, yes ma'am.

Ms. Picciotto testified that she attended high school with appellant and, after graduation, they were briefly romantically involved. She also testified that she knew Mr. Schuster from high school, contending that it was he who contacted her through MySpace and renewed their friendship. On March 31, 2009, she stated that she was at the park with appellant and George Yik, one of her best friends. She said that appellant used her cellular telephone to send the text message to Mr. Schuster, inviting him to the park. According to Ms. Picciotto, when Mr. Schuster arrived at the park, he and she conversed for a short time before he decided to leave. As Mr. Schuster was leaving, Ms. Picciotto asserted that appellant hit Mr. Schuster with a forty-ounce beer bottle. She said that Mr. Schuster fell to the ground, and appellant kicked him. It was at this point that Ms. Picciotto asserted that she ran home. She maintained that neither she nor Mr. Yik participated in the assault. She later sent Mr. Schuster a text message from her cellular telephone, asking if he was okay.

Ms. Picciotto claimed that she did not tell the police the truth when she was first contacted because she was scared and shocked by what happened at the park. Instead, she initially told police that someone named Todd Fisher attacked Mr. Schuster because appellant told her to "come up with a fake name." However, after she was arrested and charged with the assault, she gave police another statement and identified appellant as the attacker. During cross-examination, she admitted that she had conversations with the State after she was arrested. It was during these conversations that she was advised that the charges might be dropped if she told the truth. It was then, seven months after the incident, that Ms.

Picciotto identified appellant as the attacker, and the State dropped the charges pending against Ms. Picciotto.

Mr. Yik testified that he was friends with Ms. Picciotto and appellant, and he was aware that Ms. Picciotto and appellant had been romantically involved. He stated that he, appellant, and Ms. Picciotto were hanging out in a park near his house drinking alcohol when Mr. Schuster arrived. However, he averred that he was talking on his cellular telephone when Mr. Schuster joined them. He stated that Ms. Picciotto and appellant walked away from him, towards Mr. Schuster when Mr. Schuster arrived. Mr. Yik hung up his telephone and walked towards the group, which now consisted of Ms. Picciotto, appellant, and Mr. Schuster. Then, from "anywhere from fifty to a hundred feet" away, he saw and heard appellant hit Mr. Schuster in the head with a forty-ounce beer bottle. Mr. Yik said Mr. Schuster fell to the ground, and appellant hit Mr. Schuster with his hand. Mr. Yik quickly left and returned to his house, but did not immediately report the incident because he was afraid he would be arrested or attacked. He denied participating in the attack and maintained that Ms. Picciotto did not participate either. Furthermore, he denied communicating with Ms. Picciotto after the attack. During cross-examination, Mr. Yik acknowledged that, in November 2009, he was called to the police station by the officer investigating the case, was interrogated, and made a statement regarding the March 2009 attack. He also stated that though he and Mr. Schuster were acquaintances, they did not talk to each other that night at the park.

Detective Donald Frederick testified that he was assigned to investigate the attack on Mr. Schuster. He was unable to contact Ms. Picciotto, and issued a warrant charging her with assault. Based on the warrant, she presented herself and provided information regarding the assault, including information leading to the charges against appellant and interview of Mr. Yik. On cross-examination, Detective Frederick stated that Mr. Schuster advised that more than one person was kicking and beating him while he was on the ground. Detective Frederick's report also includes that Mr. Schuster advised

that "as they were striking him he could also hear them shouting, fuck you." The report also included that when the assault stopped, Mr. Schuster stood and attempted to chase after an individual. Due to blurred vision as a result of head injuries and blood in his eyes, however, he was unable to continue his pursuit. Detective Frederick stated that Mr. Schuster's version of the attack varied on different occasions regarding the number of attackers. Detective Frederick also advised that he viewed Ms. Picciotto's MySpace page, and that he got the impression from his observations that she had a romantic connection with appellant, who was one of Ms. Picciotto's MySpace "friends."

Finally, Officer David Jackson testified. He responded to Mr. Schuster's initial complaint. He was familiar with the park in question and advised that it was poorly lit. He also learned from Mr. Schuster that Ms. Picciotto was present during the altercation. He spoke with her, and she identified the attacker as Todd Fisher. Officer Jackson investigated Todd Fisher, but was unable to ever identify a person known as Todd Fisher after canvassing the neighborhood and searching Motor Vehicle Administration records.

### B. Discussion

Preliminarily, we note that Ms. Picciotto and Mr. Yik were the only individuals to identify appellant as the perpetrator of the assault against Mr. Schuster. Appellant contends that the evidence presented was insufficient to convict him of assault because the State presented insufficient evidence to corroborate the accomplice testimony regarding the identity of Mr. Schuster's attacker. Specifically, appellant points to the testimony of Ms. Picciotto and Mr. Yik, characterizing Ms. Picciotto as an accomplice as a matter of law and Mr. Yik as "at the very least ... an accomplice after the fact." The State counters that appellant's complaint is without merit because a rational trier of fact could have reasonably determined that Mr. Yik was not an accomplice and, therefore, provided the necessary corroboration for Ms. Picciotto's testimony, even if the jury found her to be an accomplice.

We review a challenge to the sufficiency of the evidence under the following standard:

[T]he test for evidentiary sufficiency is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Parker v. State*, 189 Md.App. 474, 487, 985 A.2d 72 (2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323 (1998)).

"At common law, the testimony of an accomplice, although uncorroborated, was sufficient to warrant a conviction if [the testimony] satisfied the trier of fact beyond a reasonable doubt of the guilt of the accused." *Brown v. State*, 281 Md. 241, 242, 378 A.2d 1104 (1977) (citing 7 J. Wigmore, Evidence § 2056 *et seq.* (3d ed. 1940)). In *Luery v. State*, 116 Md. 284, 292–93, 81 A. 681, 684 (1911), the Court of Appeals recognized the danger of allowing a conviction based solely on the testimony of an accomplice:

It is true that at common law a verdict of the jury would not be set aside merely because [it was] founded on the evidence of an accomplice which was not corroborated, but by legislation in many states of this country and by the practice of most of the courts, where there is no such statute, such a verdict is regarded as an exceedingly dangerous one, and is not approved by the Courts. In those jurisdictions where it is not positively prohibited unless corroborated, the evidence of an accomplice is universally received with caution and weighed and scrutinized with great care....

... [T]he undoubted fact is that the experience of the Courts, which is certainly much greater than that of juries, is that it is unsafe, at least in the great majority of cases, to rest a conviction upon the uncorroborated evidence of an accomplice. Any one who has had experience at *nisi prius* trials knows how captivating is the story of one relating the circumstances connected with some mysterious crime. When such a one has as a motive the prospect of freedom, a

milder sentence or the favor of the officers who have him in charge, an innocent one may undoubtedly be made to suffer, if great caution is not used. Hence it would seem to be safer to require some corroboration. . . .

Next, in *Watson v. State*, 208 Md. 210, 217, 117 A.2d 549 (1955), the Court clarified the corroboration requirement as follows:

The reason for the rule requiring the testimony of an accomplice to be corroborated is that it is the testimony of a person admittedly contaminated with guilt, who admits his participation in the crime for which he particularly blames the defendant, and it should be regarded with great suspicion and caution, because otherwise the life or liberty of an innocent person might be taken away by a witness who makes the accusation either to gratify his malice or to shield himself from punishment, or in the hope of receiving clemency by turning State's evidence.

Even with the corroboration requirement, "[n]ot much in the way of evidence corroborative of the accomplice's testimony has been required by [Maryland] cases." *Brown*, 281 Md. at 244, 378 A.2d 1104. The Court of Appeals has held that "while the corroborative evidence need not be sufficient in itself to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself." *Id.* (citing *Wright v. State*, 219 Md. 643, 150 A.2d 733 (1959)). If the corroborative evidence "tends to establish either of these matters" with "some degree of cogency," then "the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced." *Id.* (citing *McDowell v. State*, 231 Md. 205, 189 A.2d 611 (1963)). The "corroboration need not extend to every detail and indeed may even be circumstantial," but Maryland courts "have steadfastly adhered to these principles over the years since *Luery* was decided." *Id.* at 244–45, 378 A.2d 1104 (citations omitted).

In *Brown*, 281 Md. at 246, 378 A.2d 1104, the Court of Appeals recognized the "escalating prosecutorial trend freely to utilize accomplices as State witnesses" and affirmed the need "to retain the requirement that a person accused of crime not be convicted on the uncorroborated testimony of an accomplice." The court noted that "a jury instruction that accomplice testimony be examined with care and viewed with suspicion serves much the same purpose as the Maryland rule requiring corroboration[,]" but held that "although our rule may be of limited utility, we think, as our predecessors said in *Luery*, that it is 'safer to require some corroboration' of accomplice testimony." *Id.* (quoting *Luery*, 116 Md. at 293, 81 A. 681). Accordingly, the Court affirmed our decision, holding that the accomplice's testimony was adequately corroborated. *Id.* In that case, the lower court heard testimony from the defendant's mother, the defendant's daughter, and the defendant herself regarding "material facts independent of the accomplices' testimony that tended to show that the [defendant] was either identified with the perpetrators of the crime or participated in the commission of the crime itself." *Id.*

Here, Mr. Schuster did not see who attacked him, and there were inconsistencies regarding how many people attacked him. Ms. Picciotto and Mr. Yik, both of whom were present at the park during the attack, identified appellant as the sole attacker. Appellant posits that because Ms. Picciotto was, at one time, charged with assaulting Mr. Schuster, she was an accomplice as a matter of law. Ms. Picciotto initially provided police officers with the name of a nonexistent person as the attacker. Appellant further contends that because Mr. Yik did not report the crime until he was interrogated by the police eight months after the assault, he is "at the very least ... an accomplice after the fact."

The Court of Appeals recently addressed issues relating to whether a witness to a crime was an accomplice to the crime in *Silva v. State*, 422 Md. 17, 28 A.3d 1226 (2011). The Court recognized that "[i]t is well established in Maryland law that to be an accomplice a person must participate in the commission of a crime knowingly, voluntarily, and with common

criminal intent with the principal offender, or must in some way advocate or encourage the commission of the crime." *Id.* at 28, 28 A.3d 1226 (citations omitted). " '[T]he mere fact that a person witnesses a crime and makes no objection to its commission, and does not notify the police, does not make him [or her] a participant in the crime.' " *Id.* (quoting *State v. Foster*, 263 Md. 388, 394, 283 A.2d 411 (1971)). The Court held that "[i]nstead, the person must actually participate by 'assist[ing], support[ing][,] or supplement[ing] the efforts of another,' or, if not actively participating, then the person must be present and 'advise or encourage the commission of a crime' to be considered an accomplice." *Id.* (quoting *Foster*, 263 Md. at 393, 283 A.2d 411). The Court noted that "[t]he test commonly used to determine whether a witness was an accomplice is 'whether the witness could be indicted and/or punished for the crime charged against the defendant.' " *Id.* (quoting *Foster*, 263 Md. at 393, 283 A.2d 411).

A witness could fall into one of "three distinct bands" in "the spectrum of proof" under Maryland's complicity law—non-accomplice witnesses, "accomplices as a matter of fact, as determined by a jury (or a judge, acting in his or her fact-finder role, at a bench trial), or accomplices as a matter of law *vel non*, as determined by a judge." *Id.* (citing *Trovato v. State*, 36 Md.App. 183, 188, 373 A.2d 78 (1977)). "[F]or a judge to take the question of complicity from the jury and make a finding as a matter of law, 'the proof must be so clear and decisive that reasonable minds could not differ in coming to the same conclusion.' " *Id.* (quoting *In re Anthony W.*, 388 Md. 251, 278, 879 A.2d 717 (2005)). However, when " 'evidence relating to whether a witness is an accomplice is capable of being determined either way and justifies different inferences in respect thereto, the question is for the determination of the trier of fact and in a jury case should be submitted to the jury with proper instructions.' " *Id.* (quoting *Foster*, 263 Md. at 394, 283 A.2d 411).

In *Silva*, 422 Md. at 32, 28 A.3d 1226, a witness to a murder by a group of MS–13 gang members admitted that he over-

heard another individual "discuss the plan to 'disappear' the two victims[,]" but also "denied knowledge that the group would actually harm the two men." This witness also "explicitly denied that he acted as a lookout, but he also described how he stood at the bottom of the steps [leading to the field where the murders took place] when the group told him to look out for cars." *Id.* The Court of Appeals held that these "inconsistencies" in the witness's testimony were "precisely what preclude[d] a finding that he was an accomplice as a matter of law." *Id.* (citing *Trovato,* 36 Md.App. at 187, 373 A.2d 78 ("To say that [a State's witness] *might* be an accomplice . . . is not, however, to say that he must be an accomplice. . . ."); *Williams v. State,* 19 Md.App. 582, 595, 313 A.2d 700 (1974) (holding that "[t]he record did not establish that [the witness] was an accomplice as a matter of law" because "the jury could find, as [the witness] testified was the case, that he was unaware of any intent and purpose by [the defendants] to kill [the victim]")).

Another witness in *Silva,* 422 Md. at 33–34, 28 A.3d 1226, transported the eventual victims to the field where they were stabbed to death. This witness was present during the discussion of "the plan to 'disappear' the victims," so the defendant argued that this witness was an accomplice who "knowingly, voluntarily, and with [the] common criminal intent" participated in the murders with the group. *Id.* at 33, 28 A.3d 1226. However, the witness "testified that he thought he was driving [the defendant, another gang member], and the victims to a party." *Id.* Moreover, when asked if he knew that the gang members were going to kill the victims, the witness responded: "No. I was pretty curious, because [the defendant and the other gang member] treated [the victims] like they were old friends. When they got to my car they were hugging each other, so I never imagined that they were going to do something like that, but that's what happened." *Id.* The defendant also pointed to the fact that the witness did not flee the scene after he realized the victims were going to be killed and drove the eventual getaway car. *Id.* However, the witness testified

that he thought the gang members would kill him if he fled. *Id.* at 34, 28 A.3d 1226.

The Court ruled that the jury was free to credit the witness's testimony about his lack of knowledge and fear, thereby deciding whether he was an accomplice to the murders. *Id.* Alternatively, the jury could have determined that the witness was lying and was an accomplice. *Id.* In this specific instance, "[w]hen the evidence that a witness is an accomplice can go either way, it is the role of the fact-finder ... to decide whether to believe the witness." *Id.* (citing *Foster*, 263 Md. at 394, 283 A.2d 411; *Lancaster v. State*, 86 Md.App. 74, 85, 585 A.2d 274 (1991)).

■ The facts in the case *sub judice* are similar to those in *Silva*, though fortunately Mr. Schuster's injuries were much less traumatic. Here, both Ms. Picciotto and Mr. Yik testified that they witnessed appellant hit Mr. Schuster with the beer bottle and continue to hit Mr. Schuster while he was on the ground. Mr. Schuster's testimony, which varied and was unclear as to how many people were at the park, included receiving a text message from Ms. Picciotto's telephone number telling him to come to the park and mentioned more than one person "kicking and stomping" him while he was on the ground.[5] In this type of factual dispute, the fact-finder, which in this case was the jury, should make the determination as to what really occurred on March 31, 2009 at that park. For the circuit court to rule, as a matter of law, that Ms. Picciotto and Mr. Yik were accomplices in this situation would have invaded the province of the jury. *See Silva*, 422 Md. at 29, 28 A.3d 1226 (citing *In re Anthony W.*, 388 Md. at 278, 879 A.2d 717) ("[F]or a judge to take the question of complicity from the jury and make a finding as a matter of law, 'the proof must be so clear and decisive that reasonable minds could not differ in coming to the same conclusion.' ").

---

**5.** Mr. Schuster also admitted during his testimony that his memory of the events may not have been the most accurate due to the head injury he suffered.

The circuit court instructed the jury that Ms. Picciotto "may have been an accomplice," recited the definition of an accomplice, and advised the jury of the aforementioned prohibition against conviction by uncorroborated accomplice testimony. The court did not include Mr. Yik in the instruction. There was evidence that Ms. Picciotto was an accomplice to the assault, including the use of her cellular telephone to send the text message, her presence, and her first statement to police identifying "Todd Fisher" as the assailant. However, she denied acting as an accomplice, testified that appellant used her cellular telephone to send Mr. Schuster the text message, and implied that her false identification was due to intimidation by appellant. Therefore, in this circumstance, it was proper for the circuit court to allow the jury, as fact-finder, to determine Ms. Picciotto's involvement in the assault.

While there may be a reasonable argument that Mr. Yik was an accomplice, and appellant stated in the motion for judgment of acquittal that "the only evidence that [appellant] was involved in the incident ... is the testimony by ... [t]wo accomplices," the record does not reflect a request to include Mr. Yik in the jury instruction and appellant did not object to the court's mention of only Ms. Picciotto as an accomplice, omitting Mr. Yik. Therefore, any objection was waived and not preserved for our review. Md. Rule 8–131(a). Although Mr. Yik's and Ms. Picciotto's testimony diverged as to Mr. Yik's interaction with Mr. Schuster, neither testified that Mr. Yik was involved in the assault. Appellant's characterization of Mr. Yik as "at the very least ... an accomplice after the fact" for running home and not reporting the assault is misplaced because the " 'mere fact that a person witnesses a crime and makes no objection to its commission, and does not notify the police, does not make him a participant in the crime.' " *Silva,* 422 Md. at 28, 28 A.3d 1226 (quoting *Foster,* 263 Md. at 394, 283 A.2d 411). As a result, even if the jury considered Ms. Picciotto to be an accomplice, Mr. Yik's testimony identifying appellant as the assailant corroborated Ms. Picciotto's testimony and "relate[d] to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2)

to show the participation of the accused in the crime itself." *Brown,* 281 Md. at 244, 378 A.2d 1104 (citing *Wright,* 219 Md. 643, 150 A.2d 733).

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**