57 A.3d 541

**Stephen SIMMONS**

v.

**STATE of Maryland.**

No. 1893, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Dec. 19, 2012.

678

Allison Pierce Brasseaux (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Diane E. Keller (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: ZARNOCH, GRAEFF, IRMA S. RAKER (Retired, Specially Assigned), JJ.

GRAEFF, J.

Stephen Simmons, appellant, was charged with first-degree murder and related offenses in the Circuit Court for Prince George's County. Appellant's trial began on August 12, 2010. In his opening statement, defense counsel disclosed that appellant had offered to take a lie detector test. The court sustained the State's objection and gave a curative instruction.

Two days later, after the State's presentation of four witnesses, the prosecutor moved for a mistrial based on defense counsel's opening statement disclosing appellant's offer to take a lie detector test. The court granted the State's motion and declared a mistrial.

Appellant subsequently filed a motion to dismiss the charges against him, arguing that a retrial was barred by double jeopardy principles. The court denied appellant's motion.

On appeal,[1] appellant raises the following question for our review:

Did the trial court err when it denied appellant's motion to dismiss when there was no manifest necessity for the mistrial?

For the reasons that follow, we answer that question in the negative, and we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Because appellant raises only an issue of procedural error, we need not set forth all the facts adduced at trial. *See Washington v. State*, 190 Md.App. 168, 171, 988 A.2d 61 (2010). Rather, we will briefly state the nature of the case and the facts pertinent to this appeal.

The charges against appellant arose from the July 1, 2009, shooting of Mr. Christopher Wright outside his apartment. Mr. Wright's death followed an altercation between appellant and Mr. Wright's roommate, Mr. Razaq Sarumi, during which appellant shot Mr. Sarumi, injuring his leg.

After Mr. Sarumi spit outside a window overlooking the front entrance to the apartment building, which caused appellant to become angry, appellant and Mr. Sarumi argued. Appellant ultimately pulled out a gun and began "rubbing" it. He then went into an apartment on the first floor. Appellant came back out with the gun and fired one shot, which grazed Mr. Sarumi's leg. At that time, Mr. Wright was standing in front of a nearby apartment.

Mr. Sarumi ran toward the road. Before he reached the median, he heard a couple of shots in the building. When he

---

1. On November 5, 2010, the circuit court granted appellant's motion to stay trial pending the resolution of this appeal.

turned around, he saw appellant coming out of the building. Appellant then fired a shot from the sidewalk. After that shot, Mr. Sarumi ran across New Hampshire Avenue and saw appellant and appellant's girlfriend running toward University Boulevard. Mr. Sarumi called 911.

On July 3, 2009, Mr. Sarumi viewed a photo array. He identified appellant as the person who shot him and who had the gun prior to the shooting.

Officer Ricky Serrano, a member of the Prince George's County Police Department, responded to the apartment building at 9:47 p.m. When he arrived, he saw drops of blood on the steps leading to the door of Apartment 101. On the steps leading to the second floor, he found a black male face down with a gunshot wound to his back. The man was not conscious or responsive.

Prior to trial, appellant filed a motion to suppress the statement he had given to the police after he was arrested, arguing that the statement was made involuntarily. After a hearing, the circuit court denied appellant's motion.

During opening statement, appellant's attorney asserted that, following his arrest, appellant was mistreated by the police and tricked into making an involuntary statement. Defense counsel stated:

[DEFENSE COUNSEL]: You will hear that when my client was arrested, he was held for ten hours in a frigid interrogation room. He was given no food. He was allowed to make no phone calls. He had no grandmother or paid lawyers rushing down to help him. He was entirely alone. And a rotation of experienced homicide detectives tried every trick in the book to try to get Stephen Simmons to admit that he had shot Christopher Wright.

They even lied to him. They told Stephen Simmons that Christopher Wright had survived and had identified him as the shooter. But even though he was shivering cold, he was exhausted and utterly alone, Stephen Simmons had one thing on his side that protected him. He was actually innocent of the death—

**[PROSECUTOR]:** Objection.

**[DEFENSE COUNSEL]:**—of Christopher Wright.

**THE COURT:** The objection is sustained as to innocence. The State's burden is to prove guilt beyond a reasonable doubt. That's a factual issue for you. The assertions by the attorneys are to be ignored in that regard.

You may continue, counsel.

**[DEFENSE COUNSEL]:** Thank you, Your Honor.

You will hear him protest his innocence through the long hours of questioning, tell the detectives over and over again the one thing that he knew to be true, "I did not shoot that man...." Stephen Simmons offered to take a lie detector test.

**[PROSECUTOR]:** Objection.

**THE COURT:** The objection is sustained. Let me just tell you jurors when all the evidence begins, you're going to have to consider the evidence as opposed to what counsel says, what the State says, and what the defense says. But I sustained the objection with regard to the lie detector test. That's not something you can consider. It's not something you can be permitted to consider.

The State then began the presentation of its case against appellant. The next day, the court recessed early to consider the admissibility of the testimony of the State's firearms expert, which the court ultimately determined was not admissible.

The following day, the prosecutor requested that the court declare a mistrial based on defense counsel's opening statement that appellant "offered to take a lie detector test." In making his motion, the prosecutor asserted that he was very aware that, if the State's motion for a mistrial was granted, appellant would argue that retrial was barred based on double jeopardy. He indicated that he did not make this request lightly, stating that he "spent all night thinking about whether to make this motion."

The prosecution argued that defense counsel's comment in opening statement left the State in an untenable position because it was prohibited from introducing any evidence regarding polygraph examinations. Specifically, he asserted:

[W]e're in a position where prior to the State introducing any evidence, defense counsel has told the petit jury, who has absolutely no instructions, no law, they have no information about the case, that his belief was there would be evidence that the defendant offered to take a lie detector test. Now, the State has absolutely no way to confront the defendant on that, no way to present evidence as to the voracity [sic] of that, or present evidence to deal with that issue.

The prosecutor relied on *Kosmas v. State,* 316 Md. 587, 592, 597–98, 560 A.2d 1137 (1989), where a witness disclosed that the defendant had declined to take a lie detector test, and the Court of Appeals determined that some references to polygraph examinations are so prejudicial that they cannot be addressed solely through the court's curative instructions. The Court stated that such a statement "is akin to the placing of a nail in a board. The nail can be pulled out, but the hole made by the nail cannot be removed." *Id.* at 598, 560 A.2d 1137.

According to the prosecutor:

That's the exact situation we're in here. There is no argument that defense counsel can offer to the Court that that nail that went into every single juror's brain about defendant offering to take a lie detector test, although it can be removed by you sustaining the objection, giving a curative instruction, the hole is still there.

I can't confront the defendant about it because he has a constitutional right to remain silent. I can't admit evidence concerning the voracity [sic] of that statement or confront that statement. So I'm left starting out with a petit jury, despite whatever evidence I introduce, that already has an

impact that I cannot address. If that's not manifest neces-
sity, I don't know what is.

The prosecutor concluded by arguing:

The State cannot be assured, based on that comment and
despite the Court's immediate curative instruction, that I'm
not sitting there with one, two, three, or more jurors who
will consider that fact, because it is such a powerful piece of
information that cannot be addressed, that manifest necessi-
ty requires the Court to grant a mistrial and we start anew.
The State deserves a fair trial just as much as the defen-
dant, and the moment those words were uttered, that nail
was nailed, that hole was made, and although you can pull
out the nail, you cannot fill in that hole.

Appellant's attorney responded that his statement was "in
the context of addressing a statement that the State had made
every indication was going to be admitted by them at trial."
He stated:

I would remind the Court that we had a suppression
hearing in which I was opposing the admission of my client's
statement, a recorded statement, that I had had the oppor-
tunity to hear ten hours[ ] worth of, and never at any point
did the State indicate to me that they were interested in
only part of the statement. And when I made my opposi-
tion known, I asked to have the statement suppressed both
on the entirety and the final two hours, which occurred after
more events of constitutional dimension, the State argued
for every part of the statement to come in, that they
intended to use it in their case in chief.

Counsel contended that the State had not indicated that it
intended to use only a portion of appellant's statement during
the trial; therefore, assuming that the State was going to
present appellant's whole statement to the jury, defense coun-
sel commented during his opening statement upon those parts
of the statement that were favorable to appellant. He de-
scribed the statement about the lie detector test as "a fleeting
reference," which was made during opening statement and not
by a witness as evidence.

Defense counsel further argued that any misstatement so prejudicial as to justify a mistrial under the manifest necessity standard would be so immediately obvious as to engender an immediate request for a mistrial. Here, however, the request was not made until two days later, "after a number of State's witnesses [had] testified," and the "State has had an opportunity to make an assessment of whether they've been effective witnesses or not." Appellant's attorney suggested that the State's failure to request a mistrial immediately after he made the improper statement indicated that the prosecutor had a different motive for his tardy motion for a mistrial. He argued that the motion was motivated more by the trial court's exclusion of the expert testimony of the State's firearms examiner than by any fear that the jury was prejudiced by defense counsel's "fleeting" reference to appellant's offer to take a lie detector test, which was promptly addressed by the court through a curative instruction.

The prosecution disputed the assertion that the motion for mistrial was motivated by the exclusion of the firearms examiner, as opposed to the prejudice from defense counsel's statement. Noting that the firearms examiner "had a very limited opinion," which was "that a fragment of a bullet or casing that was found at the crime scene and the slug or the cartridge that was taken out of the body of Christopher Wright, had similar class characteristics," the prosecutor explained that the firearms evidence "had no direct relation to the defendant" and "very little impact on proving the defendant's guilt. It was simply for corroboration purposes and to show that the State had done what should be done in cases, which is to adequately investigat[e] them and all the evidence related to them."

The circuit court credited the State's explanation, stating that it did "not question the motive of the State in filing a motion for mistrial at this point in time." The court's assessment of the importance of the firearms expert's testimony was:

It really is not powerful evidence [in] the Court's opinion and the prosecution of this case[,] within the Court's assess-

ment so far from opening statements and what [it's] observed and the observation of the videotaped interrogation[,] is that this case is going to rise and fall upon whether or not the jury believes the testimony of Mr. Sarumi and/or other persons who will testify.

The Court found that the delay in making the motion for a mistrial was not evidence of an improper motive, stating that it did not see "any reason for the State to be trying to make a runaround the evidence that has been allowed or not allowed and to seek refuge in an opportunity to get those things in by virtue of the declaration of a mistrial."

Noting that the State had made a timely objection to the comment defense counsel made in opening statement, it characterized its response "to be somewhat of a blurt, so to speak, in an effort to cure what the [c]ourt accepts as an absolute transgression as to presenting to a jury the notion that that which is inadmissible might be considered." The court stated:

An opening statement is a powerful setting when counsel has the opportunity to introduce into the minds of the jury what will and what will not be presented to them in determining the issues in the case. The Court would accept that a lot of flourish is allowed with regard to opening statements and closing arguments, but the Court believes that each counsel is charged with respecting and appreciating certain limits.

In this particular instance, we're dealing with a statement not made by a witness, not unexpectedly presented by a witness, but a statement carefully made as part of a preview of the evidence to the jury. Indeed, considering that the jury has no right to expect that Mr. Simmons would testify, and that even if he were to testify, his testimony would be, "I did not shoot anyone," the statement, in effect, constituted a substitute for the defendant's testimony.

The Court, especially upon the cross-examination quite skillful of Mr. Sarumi, is satisfied that credibility is central to the prosecution of this case. It's central to the defense of the case. The Court considers the motion to be timely.

The Court believes that the prejudice to the State's ability to have a fair trial is clear, because in a case so close as this, that relies upon the credibility of witnesses, there is no way to erase the potential infection of the jurors' minds as to, well, he offered to take a lie detector test. That satisfies it for me. It may not be articulated, but that might be the determining factor.

The Court finds that as a matter of manifest necessity, a mistrial must be declared to ensure that the State is not deprived of a fair trial, and to ensure that the jurors are not permitted to allow knowledge that there was an offer of a lie detector test to cause them to find that the State was not able to meet its burden.

A mistrial is declared.

■ On August 26, 2010, appellant filed a Motion to Dismiss Charges Due to Violation of Double Jeopardy. Appellant argued that there was no manifest necessity warranting a mistrial. By order filed on August 27, 2010, the circuit court denied appellant's motion. On September 13, 2010, appellant filed a timely Notice of Appeal.[2]

## DISCUSSION

Appellant asserts that the circuit court erred in denying his motion to dismiss the charges against him. Noting that double jeopardy principles prohibit a retrial if a court grants a mistrial over the defendant's objection and there is no manifest necessity for a mistrial, appellant contends that the trial court here abused its discretion in finding manifest necessity to support a mistrial. He argues that the reference in open-

---

2. Although generally, " 'the right to seek appellate review of a trial court's ruling ordinarily must await the entry of a final judgment,' " *Addison v. State*, 173 Md.App. 138, 153, 917 A.2d 1200 (2007) (quoting *Salvagno v. Frew*, 388 Md. 605, 615, 881 A.2d 660 (2005)), the Court of Appeals has recognized "the right under the collateral order doctrine to take an immediate appeal from the denial of a motion to dismiss a criminal charge on double jeopardy grounds." *Anderson v. State*, 385 Md. 123, 128, 867 A.2d 1040 (2005). *Accord Mansfield v. State*, 422 Md. 269, 274 n. 2, 29 A.3d 569 (2011).

ing statement to his offer to take a lie detector was isolated, his credibility was not at issue, the evidence against him "appeared strong at the point the mistrial was declared," no inference could be drawn as to the results of the test, and it was irrelevant that defense counsel made the remark. Attacking the motives of the prosecutor, he asserts that, "[g]iven both the delay in making the motion and the timing of when it was made," it can be inferred "that the prosecutor sought the mistrial because he perceived his case was going poorly and not because he perceived he had been unfairly prejudiced by one sentence in an opening statement."

The State contends that the circuit court correctly denied appellant's motion to dismiss because manifest necessity required the grant of a mistrial. It asserts that appellant's counsel "placed highly prejudicial, inadmissible information before the jury." By stating that appellant "offered to take a polygraph examination as evidence that he was actually innocent," this statement was made "in a fashion that was tantamount to improper vouching." The State further argues that the trial court properly found that the prosecution moved for a mistrial "because of the damage done by defense counsel's improper opening remarks, not for an improper purpose."

Generally, the State is afforded only a single opportunity to require a defendant to stand trial. *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, "protects individuals from being tried for the same offense more than once," providing, in pertinent part: " 'nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb.' " *Taylor v. State*, 381 Md. 602, 610, 851 A.2d 551 (2004) (quoting U.S. CONST. amend. V).

Where, as in the instant case, the jury has been empaneled and sworn, the protection of the Double Jeopardy Clause has attached. *Hubbard v. State*, 395 Md. 73, 90, 909 A.2d 270 (2006). Once jeopardy attaches, the State is prohibited from retrying the accused if the trial court declares a

mistrial without the defendant's consent, " 'unless there is a showing of "manifest necessity" to declare the mistrial.' " *Taylor*, 381 Md. at 611, 851 A.2d 551 (quoting *State v. Woodson*, 338 Md. 322, 329, 658 A.2d 272 (1995)). The " 'manifest necessity' " standard has been interpreted as meaning that "a mistrial is appropriate when there is a 'high degree' of necessity." *Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1863, 176 L.Ed.2d 678 (2010) (quoting *Washington*, 434 U.S. at 506, 98 S.Ct. 824).

"A trial judge shall declare a mistrial only under extraordinary circumstances and 'where there is [ ] manifest necessity' to do so." *Benjamin v. State*, 131 Md.App. 527, 541, 749 A.2d 273 (2000) (quoting *Wilhelm v. State*, 272 Md. 404, 429, 430, 326 A.2d 707 (1974)). "The declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice." *Braxton v. State*, 123 Md.App. 599, 666–67, 720 A.2d 27 (1998). "Whether manifest necessity to declare a mistrial and avoid double jeopardy exists is based upon the unique facts and circumstances of each case." *Hubbard*, 395 Md. at 90, 909 A.2d 270. The State must demonstrate that there is "no reasonable alternative to the declaration of a mistrial." *Id.* at 91, 909 A.2d 270. A trial court's decision to declare a mistrial based on its assessment of the prejudicial impact of improper argument is entitled to great deference, and it shall be reversed only for an abuse of discretion. *Washington*, 434 U.S. at 514, 98 S.Ct. 824. *Miles v. State*, 365 Md. 488, 569–70, 781 A.2d 787 (2001), *cert. denied*, 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002).

A ruling generally will not be deemed to be an abuse of discretion unless it is " 'well removed from any center mark imagined by the reviewing court and is beyond the fringe of what that court deems minimally acceptable.' " *Moreland v. State*, 207 Md.App. 563, 569, 53 A.3d 449 (2012) (quoting *Gray v. State*, 388 Md. 366, 383, 879 A.2d 1064 (2005)). *Accord Morris v. State*, 204 Md.App. 487, 492, 42 A.3d 83 (2012) (This Court will find an abuse of discretion only " 'where no reasonable person would take the view adopted by the [trial] court.' ") (quoting *King v. State*, 407 Md. 682, 697,

967 A.2d 790 (2009)). In reviewing a trial court's ruling in this regard, we observe that the trial court "is ordinarily in a uniquely superior position to gauge the potential for prejudice in a particular case." *Watters v. State*, 328 Md. 38, 50, 612 A.2d 1288 (1992), *cert. denied*, 507 U.S. 1024, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993).

In *Washington*, 434 U.S. at 498–99, 98 S.Ct. 824 the United States Supreme Court considered a factually analogous case, where the trial court granted the State's request for a mistrial after defense counsel made improper remarks during opening statement. Washington was being tried for a second time because the prosecutor had withheld exculpatory evidence from the defense at his first trial. *Id.* at 498, 98 S.Ct. 824. During opening statement, defense counsel improperly disclosed that the prosecution had purposely withheld evidence in the previous trial and a new trial was granted because of the prosecutor's misconduct. *Id.* at 499, 98 S.Ct. 824.

In upholding the trial court's determination that manifest necessity existed for a mistrial, the Supreme Court observed:

An improper opening statement unquestionably tends to frustrate the public interest in having a just judgment reached by an impartial tribunal. Indeed, such statements create a risk, often not present in the individual juror bias situation, that the entire panel may be tainted. The trial judge, of course, may instruct the jury to disregard the improper comment. In extreme cases, he may discipline counsel, or even remove him from the trial. . . . Those actions, however, will not necessarily remove the risk of bias that may be created by improper argument . . . . the trial judge must have the power to declare a mistrial in appropriate cases. The interest in orderly, impartial procedure would be impaired if he were deterred from exercising that power by a concern that anytime a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred.

*Id.* at 512–13, 98 S.Ct. 824 (footnote omitted).

The Court stated that "the overriding interest in the evenhanded administration of justice requires that we accord the

highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.* at 511, 98 S.Ct. 824. While recognizing "that the extent of the possible bias cannot be measured," and "that some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions," the Supreme Court upheld the trial court's decision that manifest necessity existed for the mistrial. *Id.* at 511, 516, 98 S.Ct. 824. In so holding, the Court declared:

> Neither party has a right to have his case decided by a jury which may be tainted by bias; in these circumstances, the public's interest in fair trials designed to end in just judgments must prevail over the defendant's valued right to have his trial concluded before the first jury impaneled.

*Id.* at 516, 98 S.Ct. 824 (footnotes omitted) (quotations omitted).

■■■■■ Here, defense counsel's comment in opening statement, that appellant had offered to take a lie detector test to prove his innocence, was improper. As the Court of Appeals has stated:

> "[I]t is universally held that evidence of the defendant's willingness or unwillingness to submit to a lie detector examination is inadmissible." "We have resisted exhortations to admit evidence regarding polygraph tests." The reliability of such tests has not been established to our satisfaction, and we have consistently refused to permit evidence with regard to them. In our system of criminal justice, the trier of fact is the lie detector, and we have been steadfast in disallowing that function to be usurped by a process we have not found to be trustworthy. Mention at a criminal trial of the results of a polygraph test, or the taking of the test, or the willingness or unwillingness to take the test, raises the specter of reversal. In criminal prosecutions, the polygraph test is a pariah; "polygraph" is a dirty word.

*State v. Hawkins,* 326 Md. 270, 275, 604 A.2d 489 (1992) (citations omitted). *Accord Pantazes v. State,* 141 Md.App. 422, 436, 785 A.2d 865 (2001), *cert. denied,* 368 Md. 241, 792 A.2d 1178 (2002).

The circuit court found that defense counsel's use of the "dirty word" here was an "absolute transgression" of the rule precluding references concerning polygraph examinations for the consideration of the jury. The question for this Court is whether defense counsel's disclosure was so prejudicial that the trial court properly exercised its discretion in determining that manifest necessity existed to declare a mistrial.

▆▆▆ When reference is made to a witness' willingness to take a lie detector test, several factors "should be considered in determining whether the evidence was so prejudicial that it denied [a party] a fair trial." *Kosmas,* 316 Md. at 594, 560 A.2d 1137. These factors include:

"whether the reference to a lie detector was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; whether a great deal of other evidence exists; and, whether an inference as to the result of the test can be drawn."

*Id.* (quoting *Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800 (1984)). "No single factor is determinative in any case. The factors themselves are not the test, but rather, they help to evaluate whether the defendant was prejudiced." *Guesfeird,* 300 Md. at 659, 480 A.2d 800.

▆▆▆ Applying these factors to the present case, we agree with the circuit court that the statement by defense counsel was so prejudicial that a mistrial was warranted. To be sure, defense counsel's disclosure of appellant's offer to take a lie detector test was an isolated statement. As the trial court noted, however, the prejudicial comment was "not unexpectedly presented by a witness," but rather, it was an assertion by appellant's attorney in the "powerful setting" of opening state-

ment, where defense counsel had the "opportunity to introduce into the minds of the jury" his theory of the case. As the prosecutor noted, opening statements can "have major impacts on juries." Defense counsel's remarks in this case were an effort to establish the credibility of appellant's claims of innocence, even without any assurance that appellant would take the stand and expose his claims to cross-examination. As the trial court observed, defense counsel's remark, "in effect, constituted a substitute for the defendant's testimony." Because appellant's willingness to take a lie detector exam was offered by defense counsel as proof that his protestations of innocence to the police were genuine, i.e., that he was not the shooter, it impacted the central issue at trial.

Compounding the prejudice accruing to the State is that there was no way for the State to explain or otherwise mitigate defense counsel's disclosure. Because the law prohibits mention of polygraph examinations, the State could not address defense counsel's improper disclosure or his implied assertion of appellant's innocence in any meaningful way.

The circuit court concluded that, given that this was a close case that relied on the credibility of witnesses, "there is no way to erase the potential infection of the jurors' minds" caused by defense counsel's improper disclosure. The court, therefore, concluded that the prejudice to the State's ability to have a fair trial was clear, that the motion for a mistrial was based on that prejudice, and not a perception that the State's case was going poorly, and that there was manifest necessity for a mistrial.

There was substantial evidence to support the trial court's factual findings in this regard. The circuit court did not abuse its discretion in determining that manifest necessity existed. *See United States v. Gantley,* 172 F.3d 422, 427–28 (6th Cir.1999) (mistrial manifestly necessary where defendant disclosed during cross-examination that he had taken a lie detector test); *Pettigrew v. Hardy,* 403 F.Supp. 869, 870 (D.Ariz. 1975) (affirming, on habeas review, state court's conclusion that a mistrial was necessary after the defendant testified that

he passed a lie detector test); *Ferby v. Blankenship*, 501 F.Supp. 89, 92 (E.D.Va.1980) (affirming, on habeas review, state court's conclusion that, after a witness testified that the defendant was willing to take a lie detector test, a mistrial was appropriate because "[curative] instructions could not preserve the integrity of the verdict").

Because there was manifest necessity to declare a mistrial, double jeopardy principles do not prevent a retrial. Accordingly, the circuit court did not err in denying appellant's motion to dismiss the charges against him.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**