79 A.3d 381

**Willie QUINONES**

v.

**STATE of Maryland.**

**No. 1370, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Nov. 5, 2013.

2

Bradford C. Peabody (Paul DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

James E. Williams (Douglas Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: WOODWARD, ZARNOCH, GARY E. BAIR (Specially Assigned), JJ.

BAIR, J.

Appellant, Willie Quinones, and his original co-defendant, Quentin Milner, were charged in the Circuit Court for Prince George's County with armed robbery and related offenses, and were jointly tried by a jury. Just as that trial was coming

to a close (after the jury was instructed, but before closing arguments), however, the State abruptly decided to enter a *nolle prosequi* on all charges relating to co-defendant Milner. This unusual development led to supplemental jury instructions and to a protracted discussion concerning the propriety of Appellant's closing arguments in light of the fact that Milner was no longer in the picture. Ultimately, the trial court declared a mistrial over defense objection during closing arguments. The defense subsequently moved to dismiss the charges on double jeopardy grounds. The motion was denied after a hearing.

This interlocutory appeal followed. Unsurprisingly, Appellant presents a single question for our review, which we have rephrased:

> Did the trial court abuse its discretion in finding manifest necessity to declare a mistrial and, as a result, err in denying Appellant's motion to dismiss the charges?

For the reasons that follow, we shall affirm the circuit court's judgment.

### FACTS AND PROCEDURAL HISTORY

On August 3, 2011, in the 900 block of Arbor Park Place in Prince George's County, three men in a black Cadillac SUV robbed and assaulted Deondre Stephens, Edward Williams, Christopher Bosompen, and Phillip Smith. Specifically, two male suspects jumped out of the Cadillac and demanded the victims' property. At least one of the suspects had a gun and used it to strike victims Smith and Williams while robbing them of their cell phones, wallets, and cash. The suspects then jumped back into the Cadillac and fled. The victim Stephens remembered that the last four digits on the Cadillac's Maryland license tag were "9045." Initially, Stephens reported that the suspects were unknown to him, but later told police that one of the suspects who exited the Cadillac was someone he thought he knew as "Willie." A trace of the black Cadillac SUV and partial Maryland license tag number of "9045" led to the registered owner, Quentin Milner, a known associate of Appellant, Willie Quinones.

The victims positively identified Milner and Quinones in a photo array. Williams identified Milner as one of the two suspects who exited the vehicle armed with a handgun and demanded the victims' property. Stephens, Bosompen, and Smith positively identified Quinones as the second suspect. On September 13, 2011, Quinones and Milner were indicted in the Circuit Court for Prince George's County on charges of armed robbery and related offenses. A joint jury trial was held on March 19 and 20, 2012. In its opening statement, the State provided the jury the following summary of its theory of the case:

[T]his case is about team work.... Now, a team has a uniform goal. Now, to achieve that uniform goal there's a unity of effort by each person whose [sic] a part of that team.... In the case before you the team consisted of Quentin Milner, Willie Quinones and an unknown person. And on August 3, 2011, Phillip Smith, Edward Williams, Deondre Stephens, and Christopher B[o]sompen were walking down the street in Bowie, Prince George's County, Maryland. As they were walking down the street, they saw a black Cadillac pull down the street. Down to the end of the cul-de-sac, turn around and park. Two people jumped out of that car. One of them was Willie Quinones. He had a handgun, and he took that gun and he struck two people. He first struck Phillip Smith in the head, cutting his face. At the same time they were saying "give that shit up." They then moved to Edward Williams and said, "give that shit up." Edward Williams froze. They struck Edward Williams in the head with the gun. At that time Christopher Bosompen and Deondre Stephens complied and gave what they had. Willie Quinones and Quentin Milner then jumped back into a black SUV and fled the area. But little known to them Deondre Stephens recognized Willie Quinones. He has known him for years.

At that point he looked, he got a partial tag. 9–0–4–5 of that black SUV. They immediately ran to a neighbor who happened to be sitting in his driveway when the robbery occurred who called 911. And in telling the neighbor, as

well as on the 911 call, "it's Willie. It's Willie. It's Willie." He recognized him.

At that point when the police department arrived, they gave the police department the partial tag of 9–0–4–5, and when they ran it, a black SUV popped up as one of the possible hits. And it came back to Quentin Milner, a known associate of Willie Quinones. They were—both defendants were placed in photo arrays, and identified by—Willie Quinones was obviously identified by Deondre Stephens. He was identified by Christopher Bosompen. And Quentin Milner was identified by Edward Williams.

The first witness called by the State was one of the victims, Deondre Stephens. Stephens testified that one of the suspects was waving a gun and used the gun to assault Williams and Smith. In court, Stephens identified Quinones as the gun-wielding robber who assaulted Williams and Smith. Furthermore, Stephens testified that he had known Quinones for more than five years, that Quinones was a friend of his brother, and that he knew him from the neighborhood. On cross-examination, Stephens testified that he told the police about "Willie" verbally, but conceded that his handwritten statement at the police station did not mention him. Stephens also testified on cross-examination that his handwritten statement indicated that one of the suspects, not Quinones, was wearing an L.A. Kings hat. Finally, Stephens testified that he was unable to identify anyone other than Quinones in the photo array at the police station and was similarly unable to identify the second suspect in court.

The second witness called by the State was another victim, Christopher Bosompen. Bosompen testified that both suspects who exited the Cadillac had guns, that the two suspects looked very different from each other, and that only one of the suspects had tattoos on his arms. According to Bosompen's testimony, Quinones was the man who got out of the passenger side door of the Cadillac, weighed about 220 pounds, was wearing an L.A. Kings hat, and was the only suspect who struck the victims.

The State's next witness was a third victim, Edward Williams. Williams testified that only the passenger had a gun, and that it was the passenger who struck him in the head with the gun. Williams testified that he saw tattoos on the passenger's arms. In court, Williams was unable to positively identify Quinones as his assailant. On cross-examination, Williams conceded that his written statement to the police said that the only suspect with a gun was the driver. Williams testified that he had been tired at the time and wrote driver instead of passenger.

On the second day of trial, Quinones and Milner were ordered to display their arms to the jury. The parties agreed that both of the defendants had tattoos on their arms. Thereafter, subsequent to the jury instructions and immediately before closing arguments, the State made the following statement, in the absence of the jury, concerning the case against co-defendant Milner:

Your Honor, in this case the State will enter this case *nolle prosequi* for the following reasons. After the jury instructions were read and the defendants were being taken out of the courtroom, the victims immediately approached me and said they need to speak with me urgently. They said based on the height of the defendant, Quentin Milner, they believe that he was not the second defendant at the crime scene. They said the second person was at least anywhere from six feet to six foot one. Almost as tall as one of the victims, Christopher Bosompen whose [sic] approximately 6′3″.

During the lunch break, I spoke with them extensively. They were adamant. Based on the height they kept—their story did not change as to the height. They also stated that although they could not identify that second defendant by face, they could identify him—well, they could give a description of him. And the description that they gave me is inconsistent with the present height of Defendant Milner so, therefore, based on that, the State has no choice, but to enter that case *nolle prosequi* because ethically we do not have enough evidence to move forward based on those statements against Quentin Milner.

The trial court accepted this disposition and co-defendant Milner was taken out of the courtroom. At a subsequent bench conference, trial counsel for Appellant informed the Court that he had advised Appellant of his right to request a mistrial and that Appellant desired to go forward with the trial. The court acknowledged Appellant's decision and noted:

Now, it's a strange situation because I would have granted you the mistrial, because of the way the whole trial went. But you're saying that your client doesn't want a mistrial. So now we have to find a way to remedy that if he wants to go forward and have this jury deliberate on his charges. That's the only option I have at this point with that decision.

After further discussion, the following colloquy ensued with regard to supplemental jury instructions:

[DEFENSE]: I'm just trying to think if there's any other curative instructions that I might ask for.

THE COURT: You're going to have to—I know. I'm going to give you time. You need some curative instructions. You can go over them.

[DEFENSE]: My thing is this. I mean, he's dropping the case against the guy because they said, oh, no, the guy came in he was 6'1". He definitely wasn't. But one of the guys, Chris testimony was that the big guy was supposed to be—

THE COURT: What is it you want me to do?

[DEFENSE]: I don't know the answer to that yet.

THE COURT: There is no answer to that except go forward or a mistrial. Those are the only two options here. They are not dropping this case. That's the only two options.

[DEFENSE]: Okay. I'm trying to think if there's an instruction that I can request about—

THE COURT: Yeah, you should ask. I mean, it could be—I don't know. Do you will notice that we now only have Mr. Quinones for your consideration. You are not to make any inference whatsoever as to the absence of Mr. Milner in terms of your deliberations. That's the only thing I can think of. I mean, I can't really tell them why. I can't tell

them anything except that he's not here and they should not consider his not being here, or one of the persons on his behalf to make a decision. I have to tell them that. I don't know anything else I can do besides that.

[DEFENSE]: Okay. Let me go over Mr. Quinones's options with him.

After further discussing matters with his attorney, Appellant reiterated his desire to go forward with the trial. Defense counsel then requested and was granted a brief recess to review his closing statement to make sure it still made sense in light of Milner's removal. After the recess, the jury returned to the courtroom and the court gave the following instruction with the consent of the parties:

Ladies and gentlemen, you will notice that Mr. Quentin Milner is no longer present. Therefore, prior instructions on separate consideration of multiple counts as to multiple defendants and conspiracy are no longer applicable to this case. You are not to make any inferences or have any discussions as to this fact during your deliberations. Thank you.

During the State's closing argument, the prosecutor reiterated that the case was "about a team effort," and referred to the participants as "the defendant's team." The circumstances that led the trial court ultimately to declare a mistrial occurred during Appellant's closing argument, which we must excerpt at some length.

[DEFENSE]: [Y]esterday morning [the State] did talk [to] you a lot about team work. He said the whole case was about team work. He wouldn't stop talking about team work. Now, we've heard all the evidence. We sorted through all of the inconsistencies and all of the contradictions that I told you were going to be there. The total lack of investigation. And after listening to his evidence, his evidence, we now know that the team he was talking about yesterday can't possibly be the two guys that were in here when this trial started.

[STATE]: Objection.

THE COURT: Sustained. Don't do that, [Defense Counsel].

[DEFENSE]: May I approach, Your Honor?

THE COURT: [Defense Counsel], I said no inferences. Thank you. [Defense Counsel], move on.

[DEFENSE]: The reason why it can't possibly be that team is because of the little things you're able to sort out through the inconsistencies and the contradictions. The team that [the State] was talking about, according to his witnesses, were to have one man with tattoos on his arms and one man with no tattoos on his arms. This morning, the team that he offered you yesterday gets up here—

[STATE]: Objection.

THE COURT: Sustained again, [Defense Counsel].

[DEFENSE]: Your Honor, can I please approach?

THE COURT: No, [Defense Counsel].

[DEFENSE]: I have to make a record of this, Your Honor.

THE COURT: I'm not going to interrupt your closing, if you want to that's fine. Go ahead. If you want to make a record that's fine.

(Thereupon, counsel approached the bench and conferred with the Court, as follows:)

THE COURT: [Defense Counsel], you are not to refer to him in this case. I gave that instruction for a reason.

[DEFENSE]: But I'm not talking about—

THE COURT: Yes, you are.

[DEFENSE]: I'm not talking about an inference. I'm talking about evidence—

THE COURT: [Defense Counsel].

[DEFENSE]: Listen to me, Your Honor. I need to be able to put this on the record to proffer—

THE COURT: Okay.

[DEFENSE]: What I'm getting at is this. There are two people, both 5'7", supposedly driving around in a car that belongs to Quentin Milner.

THE COURT: Uh-huh.

[DEFENSE]: And the evidence shows that what started out with him saying one was Willie and one was Milner clearly shows that that was all the same guy.

THE COURT: If you—

[DEFENSE]: I think it was Milner.

THE COURT: If you continue down this road, I can declare a mistrial, and I will. Manifest necessity. We have made it clear earlier that everybody will not say why. There will be no inferences, and they are not to consider it. But if you keep bringing it up, I will declare a mistrial.

[DEFENSE]: But Your Honor—

THE COURT: Out of manifest necessity because it all has to be fair on both sides.

[DEFENSE]: But Your Honor, this is evidence that he put on that the—

THE COURT: I'm telling you, [Defense Counsel], if you continue down that road, I will declare a mistrial.

[DEFENSE]: I have to show that who they are saying is Willie is actually Mr. Milner. And that's exactly what happened in this case.

THE COURT: Excuse me. No. They have not evidence. It's not the other client, have they? I don't understand how you jump to that conclusion.

[DEFENSE]: Your Honor, my argument is this. They're saying—[the State] started this trial saying that—

THE COURT: All right. I'm going to have to. If you want to continue on this, the only thing I think is fair to both sides. And I will do it. I don't see any way around it now. I really don't.

[DEFENSE]: Well, Your Honor, I have to be able to argue the evidence that's presented against—

THE COURT: If you believe that you have to be [sic] argue it in this case in the manner that you want to, and I believe that this should be a fair trial for both the State and the defense, if I declare the manifest necessity for a mistrial, I will declare a mistrial.

[DEFENSE]: Your Honor—

THE COURT: You are going to keep putting this in your argument, then I will have to do that. I'm just saying that.

[DEFENSE]: Well, Your Honor, I have to be able to argue—

THE COURT: No, you are going further than that.

[DEFENSE]: No, I'm arguing things that were presented in court from the witness stand.

THE COURT: I'm telling you. If you—you made your record. Keep going. If it reaches the point where I think it's going ... I'm just telling you that's what I'm going to have to do. I won't have a choice. I'm really not going to have a choice.

[DEFENSE]: Your Honor will do what Your Honor thinks is appropriate, but I have to argue the evidence that was presented in court.

THE COURT: All right. Okay. No problem. Keep going.

[STATE]: There was no evidence presented of mistaken identity. There was no evidence that the witnesses were confused.

[DEFENSE]: I'm getting to it. I'm going to tell you why I think that.

[STATE]: There was no evidence as to—

THE COURT: I can see right now there's going to be a problem based on your closing.

[STATE]: There's no evidence that there was mistaken identity, it's no evidence that the witnesses were confused.

[DEFENSE]: What am I supposed to do? That's absolutely ridiculous based on—

THE COURT: You think it's evidence and really, your hands are tied and there's no way to proceed then I think that the best thing is to declare a mistrial.

[DEFENSE]: I think I should be able to fairly argue the evidence that was presented to the jury.

THE COURT: I didn't say you can't argue.

[DEFENSE]: Well, Your Honor, the evidence was that two people with tattoos. One person had a tattoo, one person didn't.

THE COURT: Okay. Then you want to say, and you saw earlier.

[DEFENSE]: Right. Right.

THE COURT: Your client had tattoos.

[STATE]: Inside of his arms.

[DEFENSE]: I have an absolute, absolute right to say that the State's theory that they started this case with is absolutely wrong based on the evidence that was presented in court.

THE COURT: What theory was wrong? About your client or about Mr. Milner?

[DEFENSE]: He—he—

THE COURT: They are serious about Mr. Milner is going, but now—are you going to argue that their theory against your client is wrong or against Mr. Milner?

[DEFENSE]: I'm going to argue that you have two sets of identifications. One with Mr. Milner, one of [Appellant] against somebody whose [sic] clearly the same guy. And that's inherent reasonable doubt.

THE COURT: Excuse me? You're going to have one that what?

[DEFENSE]: Somebody—he—[the State] started this case saying Mr. Milner did something and [Appellant] did something. When the evidence came out, it's clear that was only one guy.

THE COURT: Only one guy what?

[DEFENSE]: That some people said it was [Appellant] and some people said it was Milner. We've got Milner—

THE COURT: No one ever said it was Milner.

[DEFENSE]: No, it was by inference.

THE COURT: Okay.

[DEFENSE]: No, that it was Milner. Because somebody-he was identified in a photo spread.

THE COURT: No. I can see this is going to be hard, because of where you are going in your closing. Then I'm telling you I might have to. I don't see any way around it, [Defense Counsel]. We'll have to have a clean trial from the very beginning. I don't know, but to use it at this juncture of what happened. I don't think is fair to either side to allow you to do it. He didn't try and do it in his closing. If you're going to keep harping on it, we'll see. Step back. Keep going. Step back, keep going, [Defense Counsel]. (Thereupon, the proceedings had at the bench were concluded, and the trial resumed, as follows:)

[DEFENSE]: The State presented you with a very specific team work yesterday. Today, we know that the theory that he presented you is wrong. We know that because according to his own witnesses, he should have two people before you.

[STATE]: Objection.

THE COURT: Sustained.

[DEFENSE]: We know, according to [the State's] evidence. The State's evidence that the people that did this on August 3rd, 2011 consisted of one person who was very big, 220, very tall. And one person who was a lot smaller. Yesterday he told you that it was a team. Today, no team.

[STATE]: Objection.

THE COURT: No theme, you said?

[DEFENSE]: Your Honor, can we approach again?

THE COURT: No. No. Keep going, [Defense Counsel].

[DEFENSE]: Okay. [The State] told you yesterday that the two guys sitting at that table were a team.

[STATE]: Objection. Objection.

THE COURT: It's not what [the State] said. It's not evidence so I have to sustain it. Go ahead, keep going, [Defense Counsel].

At the request of defense counsel, a bench conference was held, where the following colloquy ensued:

THE COURT: [Defense counsel] said.

[DEFENSE]: I'm absolutely allowed to refer to what he said in opening. He promised them things—

THE COURT: You just want—

[DEFENSE]: He promised them to prove that Mr. Milner and [Appellant]—

THE COURT: That's it. Okay. I will declare a mistrial. That's it. Take them back.

After the jury was excused from the courtroom, the trial court declared a mistrial based on manifest necessity, stating:

I'm going to have to declare a mistrial due to manifest necessity because [Defense Counsel], you feel you are strapped in terms of your closing argument because you want to keep referring to what [the State] promised in his opening statement when opening statement is not evidence. I have no problem with you referring to what's in as evidence. None whatsoever. It's a problem, though, that you keep referring to what the State has said it was going to do when you know for a fact that I just gave them an instruction that they're to make no inference whatsoever as to why Mr. Milner is not present. Yet you are asking them to do exactly that. To make an inference as to why Mr. Milner is no longer in the case. Yet that's an instruction I told them not to do, and yet you keep doing it. Based on that it's a mistrial. Thank you.

Subsequently, on June 12, 2012, Appellant filed a Motion to Dismiss the charges against him on double jeopardy grounds. The Motion to Dismiss was heard on June 27, 2012, and denied on August 6, 2012. On August 9, 2012, Appellant noted this interlocutory appeal.

## DISCUSSION

Appellant contends that the trial court abused its discretion in finding manifest necessity to support a mistrial and, therefore, the court erred in denying his subsequent motion to dismiss the charges against him on double jeopardy grounds. Appellant argues that the trial court failed to consider reason-

able alternatives before declaring a mistrial *sua sponte,* and that such failure is grounds for barring retrial.

■ The State argues, preliminarily, that Appellant's challenge to the trial court's finding of manifest necessity was not properly preserved because Appellant did not object to either the trial court's jury instruction regarding Milner's absence, or to the trial court's finding of manifest necessity and declaration of a mistrial. In the alternative, the State argues that Appellant's claim fails on the merits because the trial judge's decision to declare the mistrial for manifest necessity was within the sound discretion of the judge, and there was no effective alternative. Finally, the State contends that manifest necessity existed because Appellant placed prejudicial and inadmissible information before the jury during closing arguments in direct contravention of the jury instructions and failed to offer any other alternatives to a mistrial.

■ Pursuant to Maryland Rule 8–131(a), an appellate court ordinarily will not decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court." This rule "serves to prevent the unfairness that could arise when a party raises an issue for the first time on appeal, thus depriving the opposing party from admitting evidence relating to that issue at trial." *Wilkerson v. State,* 420 Md. 573, 597, 24 A.3d 703 (2011).

Once the trial court in the present case sustained multiple objections to defense counsel's closing argument, defense counsel reiterated to the court, in bench conferences, his belief that his line of closing argument was proper. After the trial court declared a mistrial, defense counsel stated:

[DEFENSE]: Your Honor, I will just state that it is absolutely appropriate and necessary for me to comment on promises the State promised to fulfill that they could not fulfill to the jury.

In response, the trial court elaborated on the reasons for declaring a mistrial, to which defense counsel responded:

[DEFENSE]: I respect the court.

THE COURT: Look.

[DEFENSE]: I just disagree with Your Honor's ruling today.

In light of defense counsel's responses to the objections raised during his closing and his stated disagreement with the court's declaration of a mistrial, we find that Appellant's argument on appeal was properly preserved. Therefore, the sole issue on appeal is whether the trial judge erred in declaring a mistrial based upon manifest necessity.

### Double Jeopardy and Manifest Necessity

 The Double Jeopardy Clause of the Fifth Amendment unequivocally bars the retrial of a defendant after a final judgment of acquittal. *Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). Where, as here, the jury has been empaneled and sworn, the protection of the Double Jeopardy Clause has attached. *Hubbard v. State*, 395 Md. 73, 90, 909 A.2d 270 (2006). Once jeopardy attaches, the State is prohibited from retrying the accused if the trial court declares a mistrial over defendant's objection "unless there is a showing of manifest necessity to declare the mistrial." *Taylor v. State*, 381 Md. 602, 610, 851 A.2d 551 (2004) (internal quotations omitted).

 Trial court judges are entitled great deference in declaring a mistrial based on their assessment of the prejudicial impact of improper argument and, accordingly, shall be reversed only for an abuse of discretion. *Washington*, 434 U.S. at 514, 98 S.Ct. 824; *State v. Fennell*, 431 Md. 500, 516, 66 A.3d 630 (2013). Time and again the Supreme Court has refused to "require, as a matter of constitutional dimension, that trial judges undertake specific steps prior to declaring a mistrial." *Blueford v. Arkansas*, —— U.S. ——, 132 S.Ct. 2044, 2052, 182 L.Ed.2d 937 (2012). Instead, in order to determine manifest necessity to declare a mistrial, the trial judge must weigh the unique facts and circumstances of each case, explore reasonable alternatives, and determine that no reasonable alternative exists. *Hubbard*, 395 Md. at 92, 909 A.2d 270. *See Cornish v. State*, 272 Md. 312, 320, 322 A.2d

880 (1974) ("[R]etrial is barred by the Fifth Amendment where reasonable alternatives to a mistrial, such as a continuance, are feasible and could cure the problem.").

In declaring a mistrial, the trial court "is ordinarily in a uniquely superior position to gauge the potential for prejudice in a particular case." *Watters v. State,* 328 Md. 38, 50, 612 A.2d 1288 (1992), *cert. denied,* 507 U.S. 1024, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993). Thus, unless the trial court's ruling is far away from "any center mark imagined" or is considered "beyond the fringe of what [the reviewing] court deems minimally acceptable," a trial court's ruling generally will not be deemed to be an abuse of discretion by the appellate court. *Gray v. State,* 388 Md. 366, 383, 879 A.2d 1064 (2005). *Accord Morris v. State,* 204 Md.App. 487, 492, 42 A.3d 83 (2012) (noting that an abuse of discretion will be found only "where no reasonable person would take the view adopted by the [trial] court") (quoting *King v. State,* 407 Md. 682, 697, 967 A.2d 790 (2009)).

In *Carter v. State,* the Court of Appeals considered whether a trial court abused its discretion in denying several defense motions for a mistrial after curative instructions were given by the court on the three separate occasions. The Court noted that "generally cautionary instructions are deemed to cure most errors, and jurors are presumed to follow the court's instructions...." 366 Md. 574, 592, 785 A.2d 348 (2001). The Court, however, emphasized that "there are some contexts in which the risk that the jury will not, or cannot follow instructions is so great" that such instructions would not be able to cure the improperly placed information. *Id.* (quoting *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)).

In *Arizona v. Washington,* a trial judge granted a mistrial at the beginning of a second trial based upon an "improper and prejudicial comment" made by defense counsel in his opening statement. 434 U.S. at 497, 98 S.Ct. 824. The defendant was originally found guilty, but a new trial was ordered because the prosecutor had withheld exculpatory evi-

dence from the defense. In his opening statement, defense counsel specifically stated that the jury would hear evidence that the prosecutor purposefully withheld evidence and because of that misconduct, a new trial was granted. *Id.* at 499, 98 S.Ct. 824. Defense counsel first argued that evidence of prosecutorial misconduct was admissible as a matter of law, however, the Court stated that argument was "foreclosed by respondent's failure to proffer any Arizona precedent supportive of his contention." *Id.* at 510–11, 98 S.Ct. 824. The Court then emphasized the degree of respect to be accorded to a trial judge when considering the effectiveness of an appropriate cautionary instruction:

"There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has seen and heard the jurors during their voir dire examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more 'conversant with the factors relevant to the determination' than any reviewing court can possibly be."

*Id.* at 511–14, 98 S.Ct. 824 (quoting *Wade v. Hunter*, 336 U.S. 684, 687, 69 S.Ct. 834, 93 L.Ed. 974 (1949)).

On review, the *Washington* Court said, in order to protect the inevitable constitutionally protected interest of any mistrial, "reviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised sound discretion in declaring a mistrial." 434 U.S. at 514, 98 S.Ct. 824 (internal quotations omitted). The Court held that the trial judge "gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial" and, as a result, exercised sound discretion in its decision. *Id.* at 515, 98 S.Ct. 824. Most importantly, the Court explained that: "Neither party has a right to have his case decided by a jury which may be tainted by bias; in these circumstances, 'the public's interest in fair trials designed to end in just judgments' must prevail over the defendant's 'valued right' to have his trial

concluded before the first jury impaneled." *Id.* at 516, 98 S.Ct. 824 (quoting *Wade,* 336 U.S. at 689, 69 S.Ct. 834).

Although Maryland courts have considered a wide spectrum of cases relating to manifest necessity and mistrials,[1] the matter at issue in this appeal is one of first impression. Courts in other states, however, have found manifest necessity for mistrials in cases factually similar to Appellant's case, i.e., where defense counsel made improper remarks during closing argument.

The Georgia Court of Appeals recently upheld a trial court's finding of manifest necessity for declaring a mistrial in a driving under the influence case. *McCabe v. State,* 318 Ga. App. 720, 734 S.E.2d 539 (2012). The trial court granted the State's motion for a mistrial when, during closing arguments,

---

1. *See, e.g., State v. Fennell,* 431 Md. 500, 66 A.3d 630 (2013) (holding that no manifest necessity existed for trial court's declaration of a mistrial when jury sent unsolicited, completed verdict sheet to trial court indicating that it intended to acquit defendant of these offenses, but that it had not agreed unanimously on the remaining two charges of robbery and second-degree assault, colloquy between trial court and jury foreperson did not indicate that jury had changed its mind as to three charges on which it indicated its intention on verdict sheet to acquit defendant, such that justification for trial court's denial of defense counsel's request for a partial verdict was unclear, and, thus, trial court should have inquired into jury's status of unanimity prior to discharging it); *Mansfield v. State,* 422 Md. 269, 29 A.3d 569 (2011) (holding that mistrial was not declared out of manifest necessity at close of evidence during bench trial where trial judge had personal, pre-jeopardy, knowledge of prior unrelated but similar sexual assault cases against defendant); *Hubbard v. State,* 395 Md. 73, 909 A.2d 270 (2006) (holding that reasonable alternative to declaring a mistrial existed, when the State called a witness, whose testimony against one of the defendants had been suppressed, to testify against the other defendant, in trial of defendants for attempted second-degree murder and associated crimes, and court declared a mistrial over defendants' objections); *State v. Crutchfield,* 318 Md. 200, 567 A.2d 449 (1989) (holding that manifest necessity existed for *sua sponte* declaration of mistrial following improper admission of defendant's highly damaging statements to police made during custodial interrogation and without prior *Miranda* warnings); *Simmons v. State,* 208 Md.App. 677, 57 A.3d 541 (2012) (holding that defense counsel's improper, prejudicial comment in opening statement of murder prosecution, that defendant had offered to take a lie detector test to prove his innocence, rendered declaration of mistrial a manifest necessity).

defense counsel continually referenced the performance re-
sults of a breathalyzer machine despite the trial judges' specif-
ic instructions against raising that issue. *Id.* at 542. Counsel
also stated multiple times that the prosecution had fought to
keep the breathalyzer results out of evidence. *Id.* at 542–43.
During closing comments, the judge sustained several objec-
tions by the State and, outside the presence of the jury,
admonished defense counsel for making those references. *Id.*
at 543. After a second dismissal of the jury and a renewed
State's motion for mistrial, the trial judge ultimately granted a
mistrial. *Id.* The primary concern of the trial judge was that
defense counsel's references made it seem like the prosecution
was hiding something, and the judge did not believe defense
counsel's actions could be cured. *Id.* In reviewing the declara-
tion of a mistrial, the court of appeals noted the trial court's
detailed discussion of the issues that led it to grant a mistrial;
specifically, that there was "no curative instruction the court
could envision that would have rectified the harm." *Id.* The
court of appeals gave "the trial court's judgment the deference
to which it [was] entitled" and held that the court's findings
supported its conclusion that there was "manifest necessity for
declaring the mistrial." *Id.* at 543.

The Indiana Supreme Court also emphasized the impor-
tance of deference to the trial judge when it upheld a lower
court's decision that a mistrial was justified by manifest
necessity due to improper prejudicial comments made by
defense counsel during closing arguments. *Brock v. State*, 955
N.E.2d 195, 197 (Ind.2011). During closing arguments of the
defendant's first trial, defense counsel made several improper
comments. *Id.* at 207. Specifically, defense counsel argued
that the state was required to prove additional elements, and
that the state's submission of the defendant's redacted driving
record was hiding facts beneficial to the defendant; both of
these assertions led to several sidebar conferences and admon-
ishment by the trial judge. *Id.* at 198. The judge considered
reopening the evidence, but ultimately declared a mistrial. *Id.*
In upholding the trial court's decision, the Indiana Supreme
Court noted that the trial judge "gave defense counsel several

chances" to change course and avoid confusing the jury. *Id.* at 207. Furthermore, the Court was not concerned that the judge had "changed his mind;" though the record was unclear as to what prompted the change, the record provided enough evidence for the Court to conclude "that the trial judge did not abuse his discretion in granting the mistrial." *Id.*

Finally, the Supreme Court of Nevada upheld a lower court's declaration of a mistrial as supported by manifest necessity when defense counsel continually referenced a statement the defendant made to the police, which the court excluded as hearsay. *Glover v. Eighth Judicial Dist. Court of State ex rel. Cnty. of Clark*, 125 Nev. 691, 220 P.3d 684, 689 (2009). The Supreme Court of Nevada noted that defense counsel had caused the mistrial when counsel continued to reference the out-of-court statement despite objections by the state and admonishment by the court. *Id.* at 698. The Court also did not find any procedural indications of abuse of discretion, and established that the trial court considered alternative remedies to the mistrial. *Id.* at 699–700. As a result, the Court upheld the lower court decision because "the potential for juror bias created a 'manifest necessity' for mistrial." *Id.* at 701.

In this case, a mistrial was granted due to Appellant's placement of improper information before the jury during closing argument. Appellant contends that there was no manifest necessity for a mistrial because less severe alternatives were still available, such as sustaining the State's objections to his improper arguments, striking his improper arguments, or providing curative instructions.

Taken together, the above-mentioned cases support the conclusion that the trial court did not err in finding manifest necessity for a mistrial. After the State *nolle prossed* all charges against co-defendant Milner, the court instructed the jury not to draw any inferences from Milner's absence during the balance of the trial. Appellant's counsel did not object to the court's instruction and was apprised of the fact that his closing argument would be limited in that respect. At no time

before closing did Appellant's counsel raise any argument that the court's instruction would impinge on his right to present an effective closing argument.

After Appellant's counsel began his closing argument, he continually referred to codefendant Milner's absence and specifically asked the jury to make inferences from his absence—exactly what the jury was instructed not to consider. At the bench, Appellant's counsel was repeatedly put on notice that his statements in closing were improper, and that a mistrial would likely result if he continued down that road.

Throughout Appellant's closing, the trial court considered reasonable alternatives to granting a mistrial by: (1) sustaining objections by the State; (2) calling counsel to the bench to discuss the parameters of his argument and to evaluate whether and to what extent it would contradict the court's instructions; (3) allowing defense counsel to continue after multiple instances of improper arguments; and (4) admonishing counsel multiple times that if he continued his line of argument, a mistrial would likely result.

Appellant ignores the above-mentioned considerations by the trial court when he contends that there was no manifest necessity for a mistrial. As the Supreme Court has noted, the State like the defense is entitled to a fair trial. *Washington,* 434 U.S. at 505, 98 S.Ct. 824 ("The right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury."); *Simmons v. State,* 208 Md.App. 677, 685, 57 A.3d 541 (2012) (holding that manifest necessity for a mistrial was established when the trial court found that prejudice to the State's ability to have a fair trial was clear and that the motion for a mistrial was based on that prejudice). We agree with the State's "bell cannot be unrung" argument, which is in line with the holding of the Court of Appeals in *Carter,* 366 Md. at 592, 785 A.2d 348; there comes a point when a theoretically available remedy becomes ineffective. *See United States v. Murray,* 784 F.2d 188, 188–89 (6th

**24**

Cir.1986) (reversing judgment notwithstanding court's curative instruction where State witness testified that defendant was asked to take a polygraph examination; observing that instructing jurors to disregard such information "is very close to an instruction to unring a bell"). By disregarding multiple admonitions from the court and making numerous improper statements during closing argument, Appellant placed highly prejudicial information before the jury that could not be cured by the trial court in any way.

Accordingly, the trial court did not abuse its discretion in finding manifest necessity to declare a mistrial. Because there was manifest necessity to declare a mistrial, double jeopardy principles do not prevent a retrial. Thus, the circuit court did not err in denying appellant's motion to dismiss the charges against him.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**